University's affirmative action procedures and occurred while he was acting in his official position and consisted only of a letter and memos addressed to the president and other members of the Board of Trustees (of which plaintiff was a member as Vice President of Human Relations), I think that the University had a significant interest in regulating the speech to make certain that it was presented in the most informative and helpful manner. Had the plaintiff presented his concerns in a public venue, my resolution of this issue would be different. The plaintiff, however, limited his speech to the confines of the University and conveyed his views in his official position as to the success or lack of success of the University's affirmative action program. I believe that in this situation the plaintiff's speech is not entitled to First Amendment protections. I think that the district court did not err in granting summary judgment in favor of the defendants on plaintiff's First Amendment claims.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0184P (6th Cir.)
File Name: 00a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————



JOHN B. JOHNSON,
    *Plaintiff-Appellant,*

*v.*     No. 98-3016

UNIVERSITY OF CINCINNATI,
JOSEPH A. STEGER, and
DONALD C. HARRISON,
    *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 96-00727—Sandra S. Beckwith, District Judge.

Argued: January 29, 1999

Decided and Filed: June 1, 2000

Before: KENNEDY, DAUGHTREY, and CLAY, Circuit
Judges.

———————

### COUNSEL

**ARGUED:** Marc D. Mezibov, SIRKIN, PINALES, MEZIBOV & SCHWARTZ, Cincinnati, Ohio, for Appellant. John B. Pinney, GRAYDON, HEAD & RITCHEY, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Marc D.

Mezibov, SIRKIN, PINALES, MEZIBOV & SCHWARTZ, Cincinnati, Ohio, Ted L. Wills, Cincinnati, Ohio, for Appellant. John B. Pinney, Michael A. Roberts, GRAYDON, HEAD & RITCHEY, Cincinnati, Ohio, for Appellees.

CLAY, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. KENNEDY, J. (pp. 39-44), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. Plaintiff, John B. Johnson, who is African American, was employed by the University of Cincinnati ("the University") as its Vice President of Human Resources and Human Relations from August 1, 1993 to January 17, 1996, when he was terminated. Central to Plaintiff's role as Vice President of Human Resources was his management of the University's affirmative action program, for which Plaintiff had primary responsibility. Following his termination, Plaintiff filed suit against the University; Dr. Joseph Steger, the University's president; and Dr. Donald Harrison, the University's Senior Vice-President and Provost of University Hospital, alleging that Defendants discriminated against him by removing him from his duties because of Plaintiff's advocacy on behalf of minorities and his filing of an EEOC claim against the University. The district court dismissed or granted summary judgment on all nine counts of Plaintiff's complaint. Plaintiff now appeals the district court's order granting summary judgment to Defendants on his claim for race and national origin discrimination brought under 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e-2; retaliatory discrimination brought under the opposition and participation clauses of 42 U.S.C. § 2000e-3(a); as well as his claim brought under 42 U.S.C. § 1983 for violation of his right to free speech under the First Amendment. For the reasons set forth below, we **AFFIRM in part**, **REVERSE in**

claim under the participation clause of section 2000e-3(a) should be liberally construed and his termination occurred in close proximity to his filing of an EEOC claim while complaints with respect to his performance occurred over an extended period, I agree with the majority that the district court erred in granting summary judgment on this claim.

Finally, I turn to plaintiff's claims under the First Amendment. While I am aware of the cases in which courts have held that discussions of affirmative action are a matter of public concern, I do not think those cases apply where the speaker is a high level affirmative action official and the communications are within the organization. In his position at the University, the plaintiff's job was to advocate on behalf of minorities. Technically, every word that the plaintiff spoke during his tenure in this position concerned affirmative action because of the nature of his job. In the unique circumstances of this case, I do not think that the plaintiff is entitled to the protections of the First Amendment unless he can show that his speech was not integrally connected with his job. When considering whether an employee's speech is protected by the First Amendment, this Supreme Court has adopted a two part inquiry. First, the Court asks whether the speech was of public concern. If that question is answered in the affirmative, the next question is whether the plaintiff's interest in speaking outweighed the defendant's interest in regulating his speech. *See Connick v. Meyers*, 461 U.S. 138, 146, 103 S.Ct 1684, 1690, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968). In this case, I do not think that the inquiry can be separated into two steps. Instead, the two steps merge when the employee's position requires him to speak on issues that normally would be of public concern. Because the plaintiff's speech concerned the inner workings of the

———————————

The majority can point to no case where discrimination based on general advocacy of minority rights has been found to violate either § 1981 or Title VII. What if the general advocacy is for a plan that fails to meet the standard of *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S. Ct. 706, 102 L.Ed.2d 854 (1989)?

matters in the course of employment.  I do not believe this case can be distinguished from *Holden*.  An affirmative action official's job is to advocate on behalf of minorities and the majority's holding that when an affirmative action official disagrees with his employer he has a cause of action under Title VII creates a disincentive for employers in their decision to establish an affirmative action officer position.  The majority attempts to distinguish *Holden* by stating that the plaintiff was not protesting the implementation of an affirmative action program, but rather, he was protesting discrimination in hiring.   In reality, there is no distinction.  The plaintiff contends that he was terminated for his active advocacy on behalf of minorities, yet, this was his job.  If he was not performing his job to the satisfaction of his employers, the University is entitled to dismiss him.  The plaintiff has presented no evidence that his advocacy went beyond the scope of his employment, and I believe this is significant.  I do think that the plaintiff's employment as a high level affirmative action officer does and should make a difference in the analysis of his claims.  Because it was his job to advocate on behalf of minorities I do not think he is entitled to protected status for his general advocacy on behalf of minorities.  For this reason, I believe that the defendants are entitled to summary judgment on plaintiff's claims under section 1981, section 2000e-2 of Title VII and the opposition clause of section 2000e-3(a)Title VII.[2]  Because the plaintiff's

---

[2]When you come to the claim that Dr. Steger violated § 1981 because of plaintiff's general advocacy for the use of the affirmative action plan and disagreement over the President's use of the waiver for particular jobs, the plaintiff's claim is even more murky.  Plaintiff has not claimed that the University of Cincinnati violated section 1981 or Title VII in its failure to hire any specific individuals.  While he made that claim on his own behalf in the District Court, he has not appealed its dismissal.  His disagreement with the University related to the implementation of its affirmative action plan, a plan the University maintained even though the term of the plan had expired and which was adopted without any finding or admission of discrimination.

The failure to hire the African-American candidate as head of the Alliance hospitals was not even covered by the affirmative action plan.  Nor did Dr. Steger participate in it.

**part**, and **REMAND** the case back to the district court for trial.

## BACKGROUND

### A.   The University and its Affirmative Action Policy

As a federal contractor, the University is required to meet certain affirmative action obligations.  *See* 41 C.F.R. § 60-1.40; Executive Order No. 11246.  These obligations consist of, among other things, maintaining and updating affirmative action programs; analyzing the University's workforce by race and sex; analyzing areas of underutilization of women and minorities; maintaining data regarding the employment of women and minorities; and analyzing the impact of the University's employee selection process.  *See* 41 C.F.R. § 60-1.40; § 60-2.11(a); § 60-2.11(b); § 60-3.4; § 60-3.15.

In 1978, the Office of Federal Contract Compliance and Programs ("OFCCP") investigated the University and found pay disparities among African Americans and women in the University; the OFCCP therefore concluded that the University was in violation of its affirmative action duties.  *See* 41 C.F.R. § 60-1.26.  As a result, the University and  the OFCCP entered into a Conciliation Agreement wherein the University agreed to implement procedures to prevent discrimination against women and minorities.   These procedures consisted of identifying underutilized positions, creating a list of new candidates for new positions, and ensuring that the list included names of qualified women and minorities. If a non-minority male applicant was selected and if women and minorities did not appear on the candidate list, then the employing unit at the University was required to give written reasons for the omissions.  The affirmative action office was to approve or disapprove the selected person after a determination of whether sex or race was a factor in the selection.

In an effort to comply with the mandates of the Conciliation Agreement regarding the  University's hiring practice, the University developed a form – known as the A-900 form or

A-900 process – that tracked open employment positions. Under this process, the hiring manager of each department wishing to fill a vacant position, no matter how high or low in the organizational structure, was required to complete an A-900 form and submit it to the affirmative action office ("AAO"). In turn, the AAO would inform the hiring manager whether the vacant position was underutilized; meaning whether the position was one that statistically had fewer women and minorities employed than would be expected given the makeup of the overall population.

If the position to be filled was underutilized, the hiring manager was required to advertise the open position, assemble a pool of candidates, select a candidate, and send the information to the AAO. If the selected candidate was not a member of the underutilized class, then the affirmative action director and the hiring manager would consider whether sufficient numbers of members of the underutilized class were considered. The affirmative action director could reject the selected candidate and require the hiring manager to begin a new search. However, Dr. Steger as president of the University, could waive the A-900 process and allow a hiring manager to hire a non-minority candidate, despite the underutilization of minorities within the particular department, and over the objection of the AAO.

Following the expiration of the Conciliation Agreement in 1980, the University's AAO fell into a state of disarray. In the spring of 1988, Dr. Steger appointed the President's Advisory Council on Race Relations and Human Decency ("PACRRHD") and charged it with examining issues of race relations at the University. The focus of the PACRRHD was to "create a diverse community in which all members feel a sense of responsibility for the elimination of ignorance, suspicion, prejudice and racism." In a report submitted to Dr. Steger on August 4, 1989, the PACRRHD noted that although African Americans occupied 28% of the University's total staff, they occupied the lower employment categories at the University in vastly disproportionate numbers. For example, African Americans occupied 74% of the service staff, 29% of

section 2000e-2 claims against the University and Dr. Steger in his official capacity cannot survive.

I also am at a loss as to how the majority can sustain plaintiff's § 1981 claim against Dr. Harrison in his individual capacity. The plaintiff has presented no evidence that Dr. Harrison influenced the University and its officials in the decision to relieve the plaintiff of his duties. In his brief to this court, the plaintiff does not even address the viability of his § 1981 claim against Dr. Harrison. Instead, he focuses his argument on Dr. Steger's role in his dismissal. I believe the plaintiff chose this tactic because there were no grounds upon which to find Dr. Harrison liable for a § 1981 violation and I believe that it is error for this court not to dismiss plaintiff's § 1981 claim against Dr. Harrison in his individual capacity.

Plaintiff's claims under § 1981 and § 2000e-2 of Title VII, along with plaintiff's retaliation claim under the opposition clause of Title VII, also fail because plaintiff has failed to establish that he is a member of a protected class. Although the majority attempts to show that it has been long established that an advocate for a minority who has been discriminated against is protected under Title VII and § 1981, I believe that the majority's analysis of our prior cases is fundamentally flawed. I agree with the majority that individuals are permitted to pursue claims of discrimination based on their advocacy of another person's rights, but, in all of these cases, the individual is advocating upon the behalf of a specific individual or specific individuals whose constitutional rights or Title VII rights have been violated. Plaintiff's claim is not based on his advocacy of specific individuals, but rather, he claims protected class status based on his general advocacy. When we extend protected class status to individuals like the plaintiff, we undermine the protections afforded by Title VII and the Constitution. Plaintiff's claim against the University and its employees basically boils down to a disagreement over the implementation of an affirmative action program. This Circuit, in *Holden v. Owens-Illinois*, 793 F.2d 745, 751 (6th Cir. 1986), held that an employee does not obtain protected status simply because the employee handles affirmative action

advocacy, the direct evidence of discrimination also must concern advocacy. I find no direct evidence in the record establishing that any of the defendants discriminated against the plaintiff based on his advocacy; therefore, the plaintiff's claim can survive only if he can establish a prima facie case of discrimination under the *McDonnell Douglas-Burdine* test. As stated in the majority opinion, the plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class or was treated differently than a similarly situated individual outside the protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). I do not believe that the plaintiff has satisfied either the first or fourth prong of this test. In my discussion of plaintiff's retaliation claim under the opposition clause of Title VII, I address the plaintiff's status as a member of a protected class. For purposes of this analysis, I will limit my dissent to the plaintiff's failure to establish the existence of the fourth prong, although I believe that my analysis of plaintiff's protected status below applies equally to these claims. The protected class to which the plaintiff claims membership can be classified as the class of advocates for minorities. The plaintiff has presented no evidence to establish either that he was replaced by someone who was not an advocate for minorities or that other "non-advocates" who were similarly situated were treated differently. The plaintiff's has failed to establish a prima facie case of discrimination; therefore, his section 1981 claims against Dr. Steger and Dr. Harrison in their individual capacity and his

give me adequate support for my position on both campuses.

The plaintiff does not raise any issues contending that he experienced discrimination based on his race or national origin and any attempt to construe his claim as anything but a claim based on his advocacy of minority rights is erroneous. Recasting the plaintiff's claim as one of advocacy on behalf of specific individuals as the majority appears to do, rather than one of general advocacy, fails because the plaintiff presented no evidence connecting his advocacy on behalf of these specific individuals to his discharge.

the technical staff, and 33% of the secretarial staff; however, African Americans occupied only 10% of the executive/administrative staff and 11% of the professional/non-faculty staff. Based on these findings, the PACRRHD recommended a new comprehensive affirmative action initiative at the University with specific goals toward increasing the number of minorities in upper level positions. The PACRRHD also recommended the creation of a new high level position to head the affirmative action program. The individual selected for this position would report directly to the president and have Cabinet-level status, and would be responsible for "following current Affirmative Action functions, as well as the development of new programs, policies and diversity initiatives to improve and enhance the quality of life." In response to the PACRRHD's recommendations, the Vice President of Human Resources and Human Relations ("VPHHR") position was created wherein the individual occupying that role would be in charge of both human resources and the affirmative action program.

## B.  Plaintiff's Role and Course of Employment at the University

In 1993, Dr. Steger recruited Plaintiff to serve as the VPHHR following a national search. Plaintiff signed a three-year contract and began his duties as VPHHR on August 1, 1993. Plaintiff was the second person to occupy this role; and there was a period of time before Plaintiff was appointed that the position was unoccupied and the AAO was without a permanent head. As a result, at the time Plaintiff was brought aboard, the AAO was in state of disorder and flux. There was a back log of A-900 forms that had accumulated during the time the AAO was without a head, as well as large number of A-900 waivers. For example, there were approximately 300 waivers of the A-900 process from 1992 to May of 1994. Plaintiff expanded the AAO, and hired George Wharton as its director in September of 1994.

Plaintiff was troubled by what he perceived to be the excessive number of waivers of the A-900 process, and in

July of 1994, Plaintiff sent a memorandum to the Cabinet members entitled, "Is there an Affirmative Action Commitment?" In the memorandum, Plaintiff expressed his concern about the number of waivers in the A-900 process, questioned the University's commitment to equal employment opportunities, and warned that continued violations could cause the OFCCP to enforce a new conciliation agreement.[1]

Throughout 1994 and 1995, Plaintiff became particularly concerned with the University's commitment to affirmative action regarding University Hospital's association in the "Alliance," a private, non-profit health care management corporation with a single board of directors created to manage and control four of the major hospitals in the community. By joining the Alliance, the University surrendered daily operation of University Hospital to the health care management group, although those employed there remained employees of the University until January 1, 1997. Despite his requests, Plaintiff was not allowed to play any meaningful role with respect to Alliance, even though the human resource counterparts from the other hospitals involved regularly contributed.

Under the Alliance agreement, the University was required to hire a Senior Executive Officer ("SEO") to run the University Hospital's daily operations. The SEO was to be an Alliance employee who reported directly to the President of the Alliance; however, the University participated in the hiring selection for this position. An outside search firm was hired to facilitate the search. The search firm identified approximately 200 resumes; out of these resumes, three candidates were selected for the final vote: a white male, an African-American male, and a white female. After

---

[1]The OFCCP in fact conducted a second audit of the University which was completed on May 26, 1995, and thereafter sent the University a completed audit outlining nine violations. However, over the objections of Plaintiff and Wharton, Dr. Steger retained the services of an outside law firm to respond to the notice from the OFCCP rather than allow Plaintiff the opportunity to respond to the violations.

---

## CONCURRING IN PART, DISSENTING IN PART

---

KENNEDY, concurring in part and dissenting in part. While I agree with the majority's resolution of the immunity issues and Dr. Johnson's retaliation claim under the participation clause, I dissent from the majority opinion because I disagree with the majority's resolution of the rest of the plaintiff's claims. In particular, I disagree with the majority's analysis of the plaintiff's claims under Title VII and § 1981. I also dissent from the majority's decision on the plaintiff's First Amendment claims.

The majority holds that the plaintiff presented direct evidence of the defendants' discrimination through his testimony concerning University officials' expressions of race consciousness during the hiring process. This testimony, however, does not provide direct evidence of the defendants' discrimination against the plaintiff based on his advocacy of minority rights.[1] Because plaintiff's claim is based on his

---

[1]In his brief to this court, the plaintiff identified three issues for review. His claims under Title VII, §1981, and the First Amendment were couched in terms of his advocacy upon behalf of minorities. In particular, his brief states the issues as follows:
"2.    Whether, for Mr. Johnson's Title VII and 42 U.S.C. §1981 claims, he had a protected status because he advocated minority rights.
3.    Whether, for Mr. Johnson's First Amendment retaliation claim, the importance of his advocacy of minority rights outweighed UC's interest in maintaining the operation of its affairs."
In addition, his complaint to the EEOC stated:
The university employs me as the Vice President for Human Resources. The institution has obstructed me from performing my assignment as the executive authorized for planning and operating human resource systems for the east and west . . .
President Joseph Stegar tells me that I am authorized to perform my executive level duties, but he also fails to

disagree with the district court's conclusion that the University's interest outweighed Plaintiff's interest in speaking out on behalf of the University's failure to comply with its affirmative action policies. Even if Plaintiff's speech delayed the University's hiring of prospective employees, this does not rise to the level of having a detrimental impact on close working relationships or undermining a goal or mission of the University. *See Meyers,* 934 F.2d at 730. To the contrary, Plaintiff's speech regarding the University's failure to comply with its A-900 process promoted or advanced the University's alleged goal of employment equality for women and minorities; his speech did not undermine that goal. Furthermore, the district court's grant of summary judgment based upon its determination that there were no material factual disputes regarding the disruptive impact of Plaintiff's complaints upon the University's business was improper in any event; the contested  issues of fact, based upon the parties' differing characterizations of the evidence, are very much in dispute and would be best left for determination at trial. *See Mount Healthy City Sch. Dist. Bd. of Educ.,* 429 U.S. at 287. We therefore reverse the district court's order granting summary judgment to Dr. Steger and Dr. Harrison individually on this claim.

## CONCLUSION

For the above-stated reasons, we **AFFIRM** the grant of summary judgment to the University on Plaintiff's claims brought under the 42 U.S.C. § 1981 and § 1983 on Eleventh Amendment immunity grounds; and to Dr. Steger and Dr. Harrison individually on Plaintiff's claims brought under Title VII. However, we **REVERSE** the grant of summary judgment to the University and Dr. Steger in his official capacity on Plaintiff's claims brought under § 2000e-2, and under both the opposition and participation clauses of § 2000e-3; and to Dr. Steger and Dr. Harrison on Plaintiff's claims brought under § 1981 and § 1983. We also **REVERSE** any corresponding pendant state law claims and **REMAND** the matter for trial.

interviewing all three candidates, Plaintiff cast his vote in favor of the African-American male based on the candidate's overall experience as well as the fact that Plaintiff found him to be the strongest of the three candidates. However, the white male was selected for the SEO position by receiving the majority of votes by the selection committee. At a July 25, 1994 meeting attended by Dr. Harrison and Plaintiff following the SEO selection, it was agreed that Plaintiff would direct the search for the next two executive level positions to become available at the University Hospital, and that efforts would be made to target minorities to fill these positions. Plaintiff sent a memorandum dated July 27, 1994, to Dr. Harrison detailing Plaintiff's understanding of the outcome of the meeting.

In August of 1995, Dr. Harrison sought a waiver of the A-900 process to fill the position of Vice Chairman of the Department of Surgery for the College of Medicine. Specifically, Dr. Harrison requested that he be able to hire Dr. James Hurst, a former member of the College of Medicine faculty, without going through the A-900 process because he knew and endorsed the former member's experience and abilities. Plaintiff sent a letter dated September 21, 1995, to Dr. Steger protesting Dr. Harrison's waiver of the A-900 process and questioning the University's commitment to providing equal opportunities in employment. Despite Plaintiff's protestations, Dr. Steger approved the A-900 waiver at Dr. Harrison's request.

A few months later, in November of 1995, the University was negotiating with District 925 of the Service Employees International Union ("925") and, as VPHHR, Plaintiff participated in the negotiations. District 925 represents the secretarial and support staff of the University. The contract between the University and 925 employees was up for renewal, and the critical issue during the negotiations was tuition remission; that is, the amount of money 925 employees would have to reimburse the University for the cost of tuition waivers granted by the University in the event the employee failed to achieve a certain minimum grade.

This issue was the final barrier to the University and 925 reaching an agreement, and the University was prepared to accept the cost of a strike if 925 did not agree to the University's terms.

Dr. Steger met with Plaintiff and Stephanie Echols, the University's representative at the negotiations, to discuss the status of the 925 matter. There is a dispute as to what transpired at the meeting inasmuch as Dr. Steger contends that the three discussed a proposal from 925, which Dr. Steger rejected; while Plaintiff contends that there was no proposal rejected at the meeting. However, that aside, the parties are in agreement that it was understood that the University would risk a strike rather than comply with the 925 remission demands. At the close of the meeting, Dr. Steger indicated that he had to leave to attend a dinner engagement, but that he could be reached at home later in the evening if developments were made in the 925 negotiations.

Echols negotiated with 925 until late into the evening, repeatedly updating Plaintiff on her progress. According to Echols, each time that she updated Plaintiff, he repeated Dr. Steger's warning that the University would accept a strike rather than concede to tuition remission. Finally, at about 11:30 p.m., Echols tentatively agreed with 925 members on a proposal that she believed would satisfy the University and informed Plaintiff of the proposed settlement. However, according to Plaintiff, he informed Echols at that time that the tentative settlement to which she agreed was not in line with what the University was prepared to accept. Echols replied that the parties had departed, and if the tentative settlement was not acceptable, it could be addressed later.

Due to the late hour -- about midnight by this time -- Plaintiff decided to wait until the morning to telephone Dr. Steger and inform him of the proposed settlement. Plaintiff telephoned Dr. Steger at his office at approximately 7:00 a.m., the next day; however, Plaintiff did not speak with Dr. Steger because he had already left for a breakfast meeting with the deans of the University. News of the proposed settlement

his complaints and concerns to Cabinet officials rather than the general public, is of no consequence because the subject matter of Plaintiff's complaints was an established matter of public concern in this circuit — "an opinion concerning the general policy of affirmative action . . . ." *See id.*; *see also Chappel v. Montgomery County Fire Protection Dist. No. 1,* 131 F.3d 564, 579 (6th Cir. 1997) ("Constitutional protection for speech on matters of public concern is not premised on the communication of the speech to the public."). The plaintiff in *Rankin* voiced her opinion about the President in a private conversation which was later reported to her employer; however, the Supreme Court found that the speech, even though internal, was nonetheless of a public concern and therefore protected because it involved the President. *See Rankin,* 483 U.S. at 386. The same reasoning applies to this case.

Therefore, having found that Plaintiff's speech was a matter of public concern, the next relevant inquiry under this claim concerns comparing the University's proclaimed need to run an efficient organization against Plaintiff's right to speak. *See Pickering,* 391 U.S. at 568. "In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers." *Meyers,* 934 F.2d at 730.

Here, the district court found that Plaintiff's speech at issue was a matter of public concern, but that the University's interest outweighed Plaintiff's right to free speech in this context, because Plaintiff's verbal complaints about the University's failure to comply with its A-900 procedure was "causing a tremendous disruption in the University's ability to deliver its services." (J.A. at 100088.) The district court based its conclusion on various evidence in the record that Plaintiff had been tying up employment decisions within the University because of his protests regarding the University's failure to follow its affirmative action program. *Id.* We

contravention of city policy on affirmative action" to two employees of an organization the purpose of which was to assist minorities in competing for jobs. *Id.* at 727. The plaintiff claimed that his statements on affirmative action led to his constructive discharge. *Id.* at 729. In finding that the plaintiff's statements were protected under the First Amendment in that they addressed a matter of public concern, we noted that the case was "analogous to *Rankin* [*v. McPherson*], not *Connick* [*v. Myers*]." *Id.* We then opined as follows:

> In *Connick* permissible employment action was taken as a result of an internal office dispute about a transfer, and the speech was concerned only with internal office policy. In *Rankin* the employee had no dispute with her employer until she stated at work that if a second attempt were made on the President's life she hoped it would be successful. The court held that in context the speech addressed the employee's dissatisfaction with the President's cuts in Medicaid, CETA and welfare benefits.
>   The Court said that "conversation addressing the policies of the President's administration . . . [made] on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President," is plainly a matter of public concern. *Rankin*, 483 U.S. at 386, 107 S. Ct. at 2898. The speech scrutinized in *Rankin* was in the form of an opinion, made in a private conversation later reported to the employee's supervisor.

*Id.* The *Meyers* Court concluded that "speech about a politically charged issue like affirmative action — whether pro or con — should be considered a matter of public concern." *Id.* at 730.

As in *Meyers*, Plaintiff's speech was made known to his supervisor, Dr. Steger, and dealt with the University's failure to comply with policies relating to its affirmative action program. Therefore, Plaintiff's speech was a matter of public concern. *See* 934 F.2d at 730. The fact that Plaintiff directed

apparently did not escape the news media, because Dr. Steger was informed of the tentative settlement during his breakfast meeting with the deans. Dr. Steger was not pleased that Plaintiff had not reached him with the latest developments, and sent Plaintiff a letter dated November 15, 1995, admonishing Plaintiff while claiming that he "was embarrassed this morning at a breakfast with the Deans when they asked me the terms of the 925 settlement. I had to say I did not know they settled -- let alone the terms." (J.A. at 298.)

Because the Board of Trustees was the body to ultimately authorize the 925 settlement, Dr. Steger requested that Plaintiff draft a summary of the settlement for the Board to review at its next meeting on November 28, 1995. The Board reviewed the summary; however, it demanded to see the full text of the agreement before they would approve it, and planned to meet again on December 18, 1995. In the meantime, apparently at Plaintiff's directive, the payroll department began programming its computers to adjust for the pay increases and back pay adjustments that were reflected in the settlement. The payroll department subsequently informed Dr. Steger that the payroll adjustments would be reflected on the December 5, 1995, paychecks despite the Board's lack of final approval because it was not possible to reverse the computer adjustments at that time. Accordingly, Dr. Steger told the payroll department to issue the checks as adjusted. On December 18, 1995, the Board, unhappy with the terms of the settlement but constrained by the adjustments in the payroll system, accepted the 925 settlement.

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on December 5, 1995, alleging race and retaliatory discrimination against the University. Plaintiff claimed that University officials, particularly Dr. Harrison, were discriminating against him because of his race as an African American, and not allowing him to fully participate in Human Resource matters in regard to University Hospital. Plaintiff also alleged that he was

retaliated against for his protestations regarding the hiring of the SEO. On or around December 20, 1995, Dr. Steger informed his Cabinet that Plaintiff had filed a discrimination complaint with the EEOC. Plaintiff met with Dr. Steger on December 20, 1995, in the course of a regularly scheduled meeting, and requested that Dr. Steger provide him with information regarding what role the Human Resource department was to play in managing the personnel affiliated with the Alliance, as well as information regarding the Board's criticisms of Plaintiff's handling of the 925 negotiations. Dr. Steger agreed to provide Plaintiff with this information in writing within a few weeks.

On January 9, 1996, Dr. Steger sent Plaintiff a memorandum outlining what Dr. Stegar found to be deficiencies in Plaintiff's performance as VPHHR, including Plaintiff's handling of the 925 negotiations, as well as complaints that Dr. Steger had allegedly received from other departments regarding the length of time it took Plaintiff to process an A-900 form. Dr. Steger concluded the letter by indicating that he "questioned [Plaintiff's] continued ability to occupy a leadership position in this University." In response, Plaintiff sent Dr. Steger a memorandum dated January 16, 1996, wherein Plaintiff disputed Dr. Steger's criticisms. Plaintiff also indicated that he was surprised by Dr. Steger's "attack" on his performance since he was hearing about Dr. Steger's dissatisfaction for the first time. In fact, the record indicates that Plaintiff received two written performance evaluations from Dr. Steger; one in July of 1994, and the other about a year later. Although the second evaluation was not as complimentary as the first, Dr. Steger gave Plaintiff high marks for his leadership and vision for the future in both evaluations.

The day after receiving Plaintiff's memorandum, January 17, 1996, Dr. Steger sent Plaintiff a termination notice and removed Plaintiff from his duties. Plaintiff filed the instant suit on July 25, 1996.

147. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48.

If Plaintiff's speech in this regard is found to be a matter of public concern and thus protected, the next inquiry is whether Plaintiff's free speech interests outweighed Defendants' interest in regulating his speech under the well known *Pickering* balancing test. *See Pickering,* 391 U.S. at 568. If Plaintiff's interests in speaking outweighed that of Defendants' interests, then Plaintiff's First Amendment rights have been violated. *See Dambrot v. Central Mich. Univ.,* 55 F.3d 1177, 1186 (6th Cir. 1995). If the First Amendment violation was a substantial or motivating factor in Defendants' action against Plaintiff, Defendants may present evidence that they would have terminated Plaintiff in the absence of his protected conduct, which is a question of fact for the jury to decide. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977).

In this case, the district court found that Plaintiff's speech on Defendants' noncompliance with its affirmative action program to be a matter of public concern. However, the court found that the University's interests maintaining its hiring process without disruption outweighed Plaintiff's right to free speech. Although we agree with the district court that Plaintiff's speech regarding the University's failure to comply with the A-900 process was a matter of public concern, we disagree that the University's purported interests outweigh Plaintiff's right to free speech.

In *Meyers v. City of Cincinnati,* this Court held that "[j]ust as an opinion concerning the general policy of affirmative action would be a matter of public concern, so too is speech concerning methods of implementing affirmative action." 934 F.2d 726, 730 (6th Cir. 1991), *modified on other grounds,* 979 F.2d 1154 (6th Cir. 1992). The plaintiff in *Meyers* held the title of "assistant fire chief in charge of personnel," and he allegedly made statements which were "in direct

Considering this evidence in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff was retaliated against for filing his complaint and charge with the EEOC.

As with Plaintiff's claim brought under the opposition clause, Plaintiff has created an issue of fact for the jury as to whether Defendants' proffered reasons for Plaintiff's discharge were merely pretextual by suggesting that Defendants' justifications possibly have no basis in fact or are insufficient to explain his discharge, and are not the true reasons for Plaintiff's termination. We therefore reverse the district court's grant of summary judgment to the University and Dr. Steger in his official capacity on Plaintiff's claim brought under the participation clause of Title VII.

## IV. SECTION 1983 CLAIM FOR VIOLATION OF FIRST AMENDMENT RIGHTS

In Count VI of his amended complaint, Plaintiff brought a claim under 42 U.S.C. § 1983, alleging that Defendants retaliated against him for voicing his concerns about Defendant's failure to properly implement and comply with the A-900 process -- Defendant's affirmative action program -- in violation of Plaintiff's First Amendment right to free speech.

As a public employee, to establish a § 1983 claim that Defendants denied Plaintiff his right to free speech under the First Amendment, Plaintiff had to prove that 1) the action was taken against him for speech that was directed toward an issue of public concern, and that 2) his interest in speaking as he did outweighed Defendants' interest in regulating his speech. *See Connick v. Myers,* 461 U.S. 138, 147 (1983); *Pickering v. Board of Educ.,* 391 U.S. 563, 568 (1968). The initial inquiry into determining whether a public employee's speech is a matter of public concern is a question of law for the court to decide. *Rankin v. McPherson,* 483 U.S. 378, 386 n.9 (1987). Absent unusual circumstances, a public employee's speech dealing with "matters only of personal interest" is not afforded constitutional protection. *See Connick,* 461 U.S. at

## DISCUSSION

## I. ELEVENTH AMENDMENT IMMUNITY DEFENSE & BARRED CLAIMS

We first address Defendants' Eleventh Amendment immunity defense because this defense raises a question of federal jurisdiction. *See Wilson-Jones v. Caviness*, 99 F.3d 203, 206 (6th Cir. 1996) ("As an Article III restriction, state immunity is jurisdictional in the same sense as the complete diversity requirement, . . . or the well-pleaded complaint rule.") (citations omitted). Regarding Plaintiff's claims brought against Defendants pursuant to 42 U.S.C. § 1981 and § 1983, the University, as an arm of the State, is immune from suit under the Eleventh Amendment because it is well-settled that a plaintiff is precluded from directly suing a State in federal court on these claims. *See Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (recognizing that claims against a State under § 1981 are barred by the Eleventh Amendment); *see also Quern v. Jordan,* 440 U.S. 332, 350 (1979) (holding that § 1983 does not override a State's Eleventh Amendment immunity). However, Plaintiff's § 1981 and § 1983 claims against Dr. Steger and Dr. Harrison in their individual capacities are not barred by the Eleventh Amendment.

Plaintiff's claims brought against Dr. Steger and Dr. Harrison in their individual capacities under Title VII cannot go forward, however, because such claims can only proceed against individuals who otherwise qualify as employers, which Plaintiff does not allege.[2]  *See Wathen v. General*

---

[2] We note that the Ohio Supreme Court has recently indicated "that for purposes of R. C. Chapter 4112, a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of R. C. 4112." *See Genaro v. Central Transport, Inc.,* 703 N.E.2d 782, 787-88 (Ohio 1999). Therefore, upon remand, Plaintiff's claim of race discrimination and retaliation brought against Dr. Steger individually under Ohio Rev. Code § 4112.99 may go forward. Because the Ohio court did not establish that a non-supervisor may be individually liable under Chapter 4112, the same does not hold true for Plaintiff's Chapter 4112 claim brought against Dr.

*Electric Co.,* 115 F.3d 400, 405 (6th Cir. 1997) ("[A]n individual employee/supervisor who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII."); *see also Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 788 n.1 (6th Cir. 2000) (recognizing *Wathen's* holding). Plaintiff's Title VII claims are permissible against the University in federal court notwithstanding the Eleventh Amendment and against Dr. Steger in his official capacity.[3] *See Alden v. Maine,* 527 U.S. 706, 119 S. Ct. 2240, 2266-68 (1999); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976) (finding that Congress abrogated the States' sovereign immunity by enacting Title VII under the Enforcement Clause, § 5, of the Fourteenth Amendment).

In summary, Plaintiff is allowed to proceed with his claims brought under Title VII against the University and Dr. Steger in his official capacity; and he is allowed to proceed with his claims brought under § 1981 and § 1983 against Dr. Steger and Dr. Harrison in their individual capacities.[4] These claims will be addressed in turn as follows.

---

Harrison individually. *See Summerville v. Ross/Abbott Labs.,* No. 98-3517, 1999 WL 623786, at **4 (6th Cir. Aug. 10, 1999). Because Plaintiff did not sue Dr. Harrison in his official capacity, Dr. Harrison is relieved of liability under Title VII and Ohio Rev. Code § 4112.

[3] Plaintiff sued Dr. Steger in his individual capacity with respect to damages, and in his official capacity with respect to Plaintiff's claim for equitable injunctive relief. However, because Plaintiff now has a new job with similar pay and benefits, the equitable relief may no longer remain at issue, and Plaintiff now seeks money damages. Furthermore, Dr. Steger claims that he has no authority to grant Plaintiff equitable relief and that he should be dismissed from suit. We leave these issues for the district court to resolve on remand.

[4] Our holdings as to Plaintiff's claims brought under Title VII apply with equal force to his claims brought under Ohio Rev. Code § 4112. *See Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm.,* 575 N.E.2d 1164,1167 (Ohio 1991) ("[W]e have determined that federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of R. C. Chapter 4112."); *see also supra* note 2.

discrimination action. *See Avery Dennison Corp.,* 104 F.3d at 861; *Zanders* v. *National R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir. 1990). Although temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence, closeness in time between the filing with the EEOC and the adverse employment action is relevant and may evince the employer's intent. *See Cooper v. City of North Olmstead,* 795 F.2d 1265, 1272-73 (6th Cir. 1986) ("The mere fact that [the plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation."). In short, in order to meet the final prong of his *prima facie* case, Plaintiff must "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity [which requires] the court to draw reasonable inferences from that evidence, providing it is credible." *See Avery Dennison Corp.,* 104 F.3d at 861. We believe that Plaintiff has met his burden of showing a temporal proximity between his filing of his EEOC complaint and his termination, coupled with other evidence, sufficient to establish causation.

For example, Plaintiff has shown that his first two performance evaluations had been strong prior to his filing of the EEOC charge. Plaintiff has also shown that the University hospital resisted his efforts, particularly with respect to the hiring of the SEO and the Vice-Chairman of the Department of Surgery, and that he was excluded from a retreat where many other human resource administrators met to discuss the hospital merger. Furthermore, the same day that Dr. Steger informed the Cabinet of Plaintiff's filing of his EEOC complaint and that they may have to defend against it, Plaintiff requested a performance evaluation from Dr. Steger and only in response to this request did Dr. Steger then scrutinize Plaintiff's performance and provide him with a negative evaluation. On January 16, 1996, Plaintiff responded to Dr. Steger's evaluation by sending Dr. Steger an evaluation accusing him of, among other things, retaliating against Plaintiff for filing and EEOC claim. The next day, Dr. Steger terminated Plaintiff from his duties at the University.

advocacy right as an affirmative action representative and his affiliation with PACRRHD. Thus, Plaintiff could have reasonably believed that he was engaging in protected activity when he filed his EEOC complaint. Our holding in this regard represents the first in this Circuit dealing with general advocacy rights under Title VII and § 1981 for a cabinet-level affirmative action/human resource vice-president.

Accordingly, having established that Plaintiff was engaged in a protected activity when he filed his complaint with the EEOC, Plaintiff has satisfied the first step of the inquiry into his *prima facie* case of retaliation. In light of the following evidence, which we view in the light most favorable to Plaintiff, we believe that he has met the next two parts of his *prima facie* case. On December 5,1995, Plaintiff filed a complaint with the EEOC, alleging discrimination on the basis of race and advocacy of minority and women's rights. On December 20,1995, Dr. Steger announced to the Cabinet that Plaintiff had filed the EEOC charge and the Defendants would have to defend themselves against the charges. That same day, Dr. Steger promised to deliver a letter to Plaintiff that outlined his standing with the University. On January 9, 1996, Dr. Steger sent Plaintiff a memorandum that enumerated several problems with Plaintiff's performance; then, on January 17, 1996, Plaintiff received his termination notice. As such, in addition to establishing that he engaged in a protected activity under Title VII by filing his EEOC complaint, Plaintiff also established that his filing was made known to the University by Dr. Steger's announcement at the Cabinet meeting, and that Plaintiff suffered an adverse employment decision.

In order to meet the final step of his *prima facie* case, Plaintiff must establish a causal link between his filing of the EEOC claim and his termination. A causal link may be shown through knowledge combined with closeness in time that creates an inference of causation. In order make such a showing, the plaintiff must produce sufficient evidence for a reviewing court to infer that the employer would not have taken the adverse action had the plaintiff not filed a

## II.   STANDARD OF REVIEW

We review a grant of summary judgment *de novo*. *See Dinsmore Instrument Co. v. Bomardier, Inc.,* 199 F.3d 318, 320 (6th Cir. 1999). Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to summary judgment as matter of law. Fed. R. Civ. P. 56(c). As the moving parties, Defendants in this case bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). Plaintiff, as the non-moving party, must then present sufficient evidence from which a jury could reasonably find for him. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). This test requires the Court to determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a mater of law." *Id.* at 251-52. In making this determination, we accept all of Plaintiff's evidence as true and draw reasonable inferences in his favor. *See National Enters., Inc. v. Smith,* 114 F.3d 561, 563 (6th Cir. 1997).

## III.  SECTION 1981 AND TITLE VII CLAIMS

### A.   Section 1981 and Section 2000e-2:   Race and National Origin Discrimination

In Count I of his complaint, Plaintiff alleges that Defendants discriminated against him on the basis of race and national origin in violation of Title VII, 42 U.S.C. § 2000e-2. Specifically, Plaintiff alleges that Defendants discriminated against him because of his efforts to insure that the University complied with its affirmative action policies, and because of his advocacy on behalf of women and minorities. In Count IV of his complaint, Plaintiff alleges that Defendants violated his right to be free from discrimination and retaliation in the making and enforcement of contracts on the basis of race, and for his promotion of minorities and women, in violation of 42 U.S.C. § 1981.

A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination. *See Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 348 (6th Cir. 1997). "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Id.* Under the direct evidence approach, once the plaintiff introduces evidence that the employer terminated him because of his race or other protected status, the burden of persuasion shifts to the employer to prove that it would have terminated the plaintiff even had it not been motivated by discrimination. *See Manzur v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1081 (6th Cir. 1994) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244-45 (1989)).

Under the circumstantial evidence approach, the familiar *McDonnell Douglas-Burdine* triparte test is employed. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), as later clarified by, *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981). This paradigm requires the plaintiff to establish a *prima facie* case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802. To establish a *prima facie* case of discrimination, a plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.[5] *See id.*; *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992). If the plaintiff is able to do so, a mandatory presumption of discrimination is created and the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.*

---

[5]The elements of *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981. *See, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993).

opposition clause, the district court found that Plaintiff did not hold a good faith belief that he was engaging in protected activity when he filed his EEOC complaint, and that Plaintiff's claim on this issue thus failed as a matter of law. The district court reasoned that Plaintiff filed his claim with the EEOC as a protective measure to insure the security of his job – because he was aware that Dr. Steger was not happy with the manner in which Plaintiff handled the 925 negotiations – and not because he reasonably believed that he was being discriminated against. Once again, we disagree with the district court.

In reaching its erroneous conclusion, the district court failed to liberally construe Plaintiff's participation clause claim and instead improperly resolved it as an issue of fact; specifically, the district court improperly determined Plaintiff's motive and good faith in filing the charge. The district court's conclusion is contrary to our decision in *Booker*:

> The "exceptionally broad protections" of the participation clause extends to persons who have "participated in any manner" in Title VII proceedings. *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998, 1006 (5th Cir. 1969). Protection is not lost if the employee is wrong on the merits of the charge, *Womack v. Munson,* 619 F.2d 1292, 1298 (8th Cir. 1980), *cert. denied*, 450 U.S. 979, 101 S. Ct. 1513, 67 L. Ed. 2d 814 (1981), nor is protection lost if the contents of the charge are malicious or defamatory as well as wrong. *Pettway*, 411 F.2d at 1007. Thus, once activity in question is found to be within the scope of the participation clause, the employee is generally protected from retaliation.

*Booker,* 879 F.2d at 1312.

Even if the district court had some basis for viewing Plaintiff's EEOC complaint as Plaintiff's way of protecting himself, this does not necessarily imply that Plaintiff did not believe that he suffered retaliation for his advocacy *prior* to the 925 negotiations. Plaintiff could have reasonably believed that he had a viable discrimination claim on the basis of his

opposition clause through his claims that he opposed Defendant's violations of Title VII, that Defendant knew of Plaintiff's opposition, and that Plaintiff's opposition was causally related to his termination. *See Walborn v. Erie County Care Facility,* 150 F.3d 584, 588-89 (6th Cir. 1998).

To fully dispose of the remaining inquires under the *McDonnell Douglas* framework, we must also determine whether Defendants offered a legitimate, nondiscriminatory reason for Plaintiff's dismissal and whether Plaintiff can show that the reasons were a mere pretext for retaliatory discrimination. Defendants offered the reasons outlined in Dr. Steger's memorandum sent to Plaintiff on January 9, 1996, wherein Dr. Steger evaluated Plaintiff's performance, as a non-exhaustive list of reasons for Plaintiff's termination; however, Defendants contend that the primary reasons that Plaintiff was terminated were his handling of the 925 negotiations and his overall poor administration of his department. In response, Plaintiff offered deposition testimony which countered all of Defendants' alleged reasons for Plaintiff's discharge, as well as evidence that other employees feared cooperating with the investigation into Plaintiff's termination because they anticipated reprisals.

After careful review of the record, we hold that Plaintiff has created an issue of fact for the jury as to whether Defendants' proffered reasons for Plaintiff's discharge were merely pretextual by suggesting that Defendants' justifications possibly have no basis in fact or are insufficient to explain his discharge, and are not the true reasons for Plaintiff's termination. We therefore reverse the district court's grant of summary judgment to the University and Dr. Steger in his official capacity on Plaintiff's claim brought under the opposition clause of Title VII.

## 2. The Participation Clause

To establish a claim of retaliation under the participation clause, Plaintiff must make a *prima facie* case by showing that Defendants discharged him because he filed a claim with the EEOC. As with Plaintiff's claim brought under the

If the defendant carries this burden, then the plaintiff must prove that the proffered reason was actually a pretext to hide unlawful discrimination. *Id.* The plaintiff may establish that the proffered reason was a mere pretext by showing that 1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; and 3) that the stated reasons were insufficient to explain the defendant's action. *See Wheeler v. McKinley Enters.,* 937 F.2d 1158, 1162 (6th Cir. 1991). "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515 (1993).

Here, the district court found that Plaintiff's claim failed under either the direct or circumstantial evidentiary pathways because Plaintiff failed to show that he was a member of a protected group. The district court held that Plaintiff's claims failed as a matter of law because Plaintiff "postur[ed] his protected status, not as a member of a racial minority, but rather as a person who advocates on behalf of women and minorities." The district court also held that Plaintiff's claims failed on these counts because as a high-level affirmative action official whose job responsibilities include advocating minority rights, Plaintiff did not engage in protected activity when he engaged in such advocacy. In other words, the district court held that Plaintiff's claims fell prey to summary judgment because Plaintiff could not claim protected status under § 1981 or § 2000e-2(a) only for his advocacy of women and minorities. We disagree. This holding is based on an unmitigated assumption: that for a high-level affirmative action official to have standing to sue under § 2002e-2(a) or § 1981, it is necessary that the affirmative action official be black – or of some other recognized protected group – and that he allege discrimination against himself because of his membership in a recognized protected group. This assumption is contrary to express Congressional intent behind the enactment of Title VII and § 1981, as well as binding case law.

Section 2000e-2(a) of Title VII provides in relevant part as follows:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin · · · ·

42 U.S.C. § 2000e-2(a) (1994). Section 1981 provides in pertinent part that all persons shall have the same right "to make and enforce contracts," which thereby "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981 (1994).

It is an established principle that Congress' primary concern in enacting the prohibition against racial discrimination in Title VII of the Civil Rights Act of 1964 was the plight of the African American in our economic society. *See United Steel Workers of Am. v. Kaiser Aluminum & Chemical Co.,* 443 U.S. 193, 201 (1979) (citing 110 Cong. Rec. 6548 (1964) (remarks of Sen. Humphrey) (stating that Title VII was "triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had 'been excluded from the American dream for so long'")). It is also well-established that affirmative action programs, which were born out of Title VII legislation, are an accepted means of correcting past and preventing future race discrimination in the workforce both in the public and private sector. *See id.* at 204. Furthermore, the Supreme Court has long recognized that § 1981, originally enacted as part of the Civil Rights Act of 1866, was intended to uproot the institution of slavery and to eradicate all of its badges, incidents, and vestiges. *See Jones v. Mayer,* 392 U.S. 409, 422-37 (1968) (finding that based upon the legislative history of the Civil Rights Act of

manner. Furthermore, in a letter dated September 21, 1995, sent by Plaintiff to Dr. Steger regarding Defendant's desire to waive advertising for the Vice-Chairman position, Plaintiff complained that "the apparent underutilization of minorities and women at the University Hospital and Medical College demonstrates the lack of commitment or intent to create an equal playing field for qualified candidates, or the development of a mentorship program which would support a safe learning environment for non-whites." Unlike *Booker v. Brown & Williamson Tobacco Co. Inc.,* where the plaintiff was contesting a single decision made by his employer in a letter which he sent to his employer's human resource department, Plaintiff in this case was opposing Defendant's discriminatory hiring conduct as a whole. *See* 879 F.2d at 1312-13 (recognizing that the lawfulness of the employment practice must be broadly construed, so that the person opposing an apparently discriminatory practice does not bear the risk that practice is in fact lawful); *see also supra* note 7. One example of Defendants' discriminatory hiring practice which Plaintiff opposed was Defendants' decision not to advertise for the Vice-Chairman position.

Accordingly, having established that he opposed conduct which he reasonably believed to be unlawful, and that Defendant was aware of Plaintiff's opposition, Plaintiff also provided evidence to show that his opposition was causally related to his discharge. For example, Plaintiff's complaints led to a reply memoranda from Dr. Steger wherein he criticized Plaintiff's character and performance, and approximately one month after Plaintiff filed his charge of discrimination with the EEOC, Dr. Steger informed Plaintiff that he was being immediately removed from his position at the University. *See, e.g., EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997); *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 229 (6th Cir. 1987); *see also* discussion *infra* Part III.B.2. discussing the causal connection between Plaintiff's filing of his EEOC complaint and his termination in reference to his claim brought under the participation clause. Thus, Plaintiff has demonstrated a *prima facie* case of retaliatory discrimination under Title VII's

by anyone and it may be made to a co-worker, newspaper reporter, or anyone else about alleged discrimination against oneself or others; the alleged discriminatory acts need not be actually illegal in order for the opposition clause to apply; and the person claiming retaliation need not be the person engaging in the opposing conduct. *See EEOC Compliance Manual* (CCH) ¶ 8006; *see also See Booker,* 879 F.2d at 1312-13 (holding that "[a] person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful"); *Keys v. U.S. Welding, Fabricating & Mfg., Inc.,* No. CV91-0113, 1992 WL 218302, at *5 (N.D. Ohio Aug. 26, 1992) (noting that "[u]nder § 704(a) of Title VII, [the plaintiff] needed only a 'good faith belief' that the company practice about which he was complaining violated Title VII; it is irrelevant whether the allegations are ultimately determined to violate Title VII").

Therefore, it logically follows that the district court's conclusion, that as a high-level affirmative action official Plaintiff could not claim protected status under the opposition clause for his advocacy on behalf of women and minorities, runs counter to the broad approach used when considering a claim for retaliation under this clause, as well the spirit and purpose behind Title VII as a broad remedial measure. By extending the scope of *Holden,* the district court allows for an employer to retaliate against the person best able to oppose the employer's discriminatory practices — the "high-level affirmative action official" — without fear of reprisal under Title VII. Indeed, the individual who has contracted to advocate on behalf of women and minorities has not thereby contracted to be retaliated against for his advocacy.

In addition, the actions taken by Plaintiff in response to hiring decisions which he felt were discriminatory and not in line with the A-900 process were sufficient to constitute opposition under Title VII. For example, Plaintiff sent letters to Dr. Steger voicing his objections to the hiring of Mr. Cohen and the Vice-Chairman of the Department of Surgery on the grounds that these individuals were hired in a discriminatory

1866, the broad language of the Act was not "a mere slip of the legislative pen").

Recently, in *Tetro v. Popham,* this Court recognized Title VII's broad reach, and held as a matter of first impression in this Circuit that "Title VII [was designed] to protect individuals who are the victims of discriminatory animus towards third persons with whom the individuals associate." *See* 173 F.3d 988, 994 (6th Cir. 1999). Relying upon the Eleventh Circuit's decision in *Par v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888, 890 (11th Cir. 1986), where it was held that a white individual had standing and had stated a viable cause of action under Title VII for discrimination based upon an interracial marriage, the *Tetro* court found that a white employee had standing and had stated a viable cause of action against his former employer under Title VII where the white employee was discharged because his child was biracial. *See Tetro,* 173 F.3d at 994. The Court reasoned that "[a] white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for the discrimination is a prejudice against the biracial child." *Id.* The Court based its reasoning on Title VII's broad remedial purpose and the fact that the statute is worded such that it "simply prohibits discrimination 'because of such individual's race'[;] [t]here is no mention of the words 'directly' or 'indirectly' in the statute." *Id.* at 995. Thus, the Court went on to hold that Title VII protects individuals who are the victims of invidious discrimination towards third persons with whom the individual associates. *Id.* at 994. Simply put, this Court has now spoken that in order to state a cognizable claim under Title VII, the plaintiff himself need not be a member of a recognized protected class; he need only allege that he was discriminated on the basis of his association with a member of a recognized protected class. *See id.*; *see also Troy v. Suburban Management Corp.,* No. 89-1282, 1990 WL 97490, at **5 (6th Cir. July 13, 1990); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 589 (5th Cir. 1998) (finding as a matter of first impression that Title VII proscribes discrimination in employment against a woman for her relationship with a

black man), *vacated and reinstated in part en banc*, 182 F.3d 333 (5th Cir. 1999).

Similarly, in *Winston v. Lear Siegler, Inc.,* 558 F.2d 1266, 1270 (6th Cir. 1997), this Court addressed as a matter of first impression, "the issue of whether or not the white plaintiff in this action has standing to sue his former employer under § 1981 for discharging him in alleged retaliation for plaintiff's protesting the alleged discriminatory firing of a black co-worker . . . ." In holding that the white plaintiff did in fact have standing to sue under such circumstances, the Court noted that although the white plaintiff "was not fired because of his race, it was a racial situation in which he became involved that resulted in his discharge from his employment, *id.* at 1268, and that Congress' intent behind the enactment of § 1981 – to eradicate the badges and incidents of slavery – were best served by such a holding. *Id.* at 1270; *see Alizadeh v. Safeway Stores, Inc.*, 802 F.2d 111, 114 (5th Cir. 1986) ("§ 1981 provides a cause of action to a white spouse who alleges that he was discriminated against in employment because of his marriage to a nonwhite.")

Therefore, based upon this well-settled state of the law, it is clear that Plaintiff need not have alleged discrimination based upon his race as an African American in order to satisfy the protected status requirement of his claims. Indeed, in light of this Court's holding in *Tetro* and *Winston*, the fact that Plaintiff has not alleged discrimination because of *his* race is of no moment inasmuch as it was a racial situation in which Plaintiff became involved – Plaintiff's advocacy on behalf of women and minorities in relation to Defendant's alleged discriminatory hiring practices – that resulted in Plaintiff's discharge from employment. *See Tetro,* 173 F.3d at 994-95; *Winston,* 558 F.2d at 1268; *see also Parr,* 791 F.2d at 892 (holding that "[w]here a plaintiff claims discrimination [in a Title VII action] based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of his race"). Although obviously not anticipated by the district court's flawed reasoning, it is clear that a Caucasian high-level affirmative

against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII. The Equal Employment Opportunity Commission ("EEOC") has identified a number of examples of "opposing" conduct which is protected by Title VII, including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer — e.g., former employers, union, and co-workers. *EEOC Compliance Manual,* (CCH) ¶ 8006.[8] The EEOC has qualified the scope of the opposition clause by noting that the manner of opposition must be reasonable, and that the opposition be based on "a reasonable and good faith belief that the opposed practices were unlawful." *Id.* In other words, a violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful. *Id.* Moreover, the person claiming retaliation need not be the person who engaged in the opposition, such that "Title VII . . . prohibit[s] retaliation against someone so closely related to or associated with the person exercising his or her statutory rights that it would discourage that person from pursuing those rights." *Id.*

In short, the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable. Of critical import here is the fact that there is no qualification on who the individual doing the complaining may be or on the party to whom the complaint is made known — i.e., the complaint may be made

---

[8]Pursuant to the Supreme Court's directive, the EEOC's interpretation of Title VII is to be given "great deference" by the courts. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 434 (1971); *see also Tetro*, 173 F.3d at 994 (relying upon the EEOC's interpretation of Title VII in support of the Court's holding); *Ladd v. Sertoma Handicapped Opportunity Program, Inc.,* 917 F. Supp. 766, 767 (N.D. Okla. 1995) (finding that "[a]lthough not binding on this Court, the EEOC's position on a subject squarely within its field of expertise is significant").

engaged in protected activity in reference to either claim. We disagree, and will address each of Plaintiff's claims in turn.

### 1.  The Opposition Clause

In conjunction with his allegations that his termination was discrimination for his advocacy on behalf of women and minorities, Plaintiff similarly contends that the University retaliated against him for his advocacy efforts in opposition to Defendants' alleged unlawful employment practices.  The district court found that Plaintiff's claim failed at the inception because, as an affirmative action official, Plaintiff could not have reasonably believed that the conduct he was opposing was protected activity.  Relying upon *Holden v. Owens-Illinois,* 793 F.2d 745, 748-49 (6th Cir. 1986), the district court reasoned that because attempts to implement an affirmative action program that complies with Executive Order 11246 are not protected by Title VII, and because Plaintiff is presumed to know the state of the law, it follows that Plaintiff could not have reasonably believed that he was opposing conduct that is protected under Title VII, and that his claim brought under this clause therefore failed.  We find the district court's application and extension of *Holden* to the facts of this case contrary to Title VII's intent.

As accurately argued by Plaintiff, the scope of *Holden* extends only to an employee who protests the *implementation* of the affirmative action program; because Plaintiff protested *discrimination* that occurred in the hiring process, which was contrary to law as well as the affirmative action program, his case falls beyond *Holden's* reach.  To hold otherwise would improperly expand the scope of *Holden* to include not only the employee who protests an employer's *failure to implement* an affirmative action program under Title VII, but also the employee who *opposes discrimination* that occurs in the hiring process the likes of which the affirmative action program was designed to correct and prevent.

Furthermore, the fact that Plaintiff may have had a contractual duty to voice such concerns is of no consequence to his claim.  Under Title VII, an employee is protected

action official could bring a claim under § 1981 and § 2000e-2(a) for discrimination based upon his advocacy on behalf of minorities because the discrimination would be "because of such individual's race," where the race of the minorities for which he was advocating would be "imputed" if you will to the Caucasian high-level affirmative action official.  *See Tetro,* 173 F.3d at 995.

Furthermore, Plaintiff's efforts to advocate for the A-900 process in the face of Defendants' alleged discriminatory practice is clearly the type of conduct protected by § 1981 and Title VII so as to provide Plaintiff standing.  For example, in *Sullivan v. Little Hunting Park, Inc.,* a case "which involve[d] an alleged discrimination against a Negro family in the use of certain community facilities," the Supreme Court found that a Caucasian homeowner had standing to sue under 42 U.S.C. § 1982 when he was expelled from a corporation organized to operate a community park facility for his "advocacy" on behalf of allowing an African-American male and his family to participate in the park facilities.  *See* 396 U.S. 229, 231-37 (1969).  Specifically, in *Sullivan*, the Court was faced with the following facts:

> Little Hunting Park, Inc., is a Virginia nonstock corporation organized to operate a community park and playground facilities for the benefit of residents in an area of Fairfax County, Virginia.  A membership share entitles all persons in the immediate family of the shareholder to use the corporation's recreation facilities.  Under the bylaws a person owning a membership share is entitled when he rents his home to assign the share to his tenant, subject to approval of the board of directors.  Paul E. Sullivan and his family owned a house in this area and lived in it.  Later he bought another house in the area and leased the first one to T. R. Freeman, Jr., an employee of the U.S. Department of Agriculture; and assigned his membership to Freeman.  The board refused to approve the assignment because Freeman was a Negro. Sullivan protested that action and was notified that he would be expelled from the corporation by the board.  A

hearing was accorded and he was expelled, the board tendering him cash for his two shares.

*Id.* at 234-35. When Sullivan and Freeman sued Little Park Hunting, Inc. under § 1981 and § 1982, the trial court denied relief to each petitioner. *Id.*

In reversing the trial court's decision, the Supreme Court held as to Freeman that he had stated a cause of action under § 1982 inasmuch as he had paid a monthly rental for Sullivan's assignment of the membership share in Little Hunting Park, and therefore the transaction in which Freeman engaged was clearly a "lease" transaction protected by § 1982. *Id.* at 236-37. The Supreme Court reasoned as follows:

The right to 'lease' is protected by § 1982 against the actions of third parties, as well as against the actions of the immediate lessor. Respondents' actions in refusing to approve the assignment of the membership share in this case was clearly an interference with Freeman's right to 'lease.' *A narrow construction of the language of § 1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866, 14 Stat. 27, from which § 1982 was derived.*

*Id.* at 237 (emphasis added) (citing *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 422-37 (1968)). The Supreme Court then found as follows regarding Sullivan's standing to bring his claims:

We turn to Sullivan's *expulsion for the advocacy of Freeman's cause*. If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property. That is why we said in *Barrows v. Jackson,* 346 U.S. 249, 259 [(1953)], that the white owner is at times 'the only effective adversary' of the unlawful restrictive covenant. Under the terms of our decision in

42 U.S.C. § 2000e-3(a) (1994). Thus, this section prohibits an employer from retaliating against an employee who has "opposed" any practice by the employer made unlawful under Title VII; and prohibits an employer from retaliating against an employee who has "participated" in any manner in an investigation under Title VII. *See Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir. 1989); *see also Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 791-92 (6th Cir. 2000). In Count V of his complaint, Plaintiff claims that Defendants discriminated against him because he "opposed" the hiring of individuals in conflict with the A-900 process; and that Defendants terminated him in retaliation for Plaintiff's "participation" in filing an EEOC claim.

To establish a claim under either clause, Plaintiff must meet the test of a slightly modified *McDonnell Douglas* framework by showing that: 1) he engaged in activity protected by Title VII; 2) this exercise of protected rights was known to Defendants; 3) Defendants thereafter took an adverse employment action against Plaintiff, or Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and 4) there was a causal connection between the protected activity and the adverse employment action or harassment. *See Morris,* 201 F.3d at 792 (citing *Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir. 1990)). If Plaintiff establishes a prima facie case under either clause, then the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for Plaintiff's discharge. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). Plaintiff must then demonstrate that the proffered reason was not the true reason for the employment action – i.e., that the reason was a mere pretext for discrimination. *Id.* (citing *Burdine,* 450 U.S. at 256).

In this case, the district court found that Plaintiff's claims brought under both the opposition clause and the participation clause of § 2000e-3(a) failed as a matter of law because Plaintiff could not have held a good faith belief that he was

and equality in employment. The approach that is in line with § 1981 and Title VII's broad remedial purpose, as well as the case law in support thereof, is to allow the *jury* to decide whether the high-level affirmative action official was discriminated against for his "advocacy" on behalf of women and minorities, irrespective of whether the advocacy was part of the official's contractual duties. That is not to say that every job-related action undertaken by a high-level affirmative action official should be considered protected conduct. However, when the action undertaken by the official is the advocacy of hiring practices that do not discriminate on the basis of race, sex, or ethnicity — such as Plaintiff's advocating a nondiscriminatory hiring practice in line with the A-900 process — the advocacy can indeed be considered protected conduct under Title VII and § 1981, and a jury should decide whether a defendant employer has discriminated or retaliated against the high-level affirmative action official for this advocacy.

In every civil rights action it is the responsibility of the jury determine whether the defendant's actions were invidious, pretextual, or improperly motivated. This case is no different. We therefore reverse the district court's grant of summary judgment to the University and Dr. Steger in his official capacity on Plaintiff's claims brought under § 2000e-2, and to Dr. Steger and Dr. Harrison individually on Plaintiff's claims brought under § 1981.

## B.  Section 2000e-3(a):  Retaliation Discrimination under the Opposition & Participation Clauses

Section § 2000e-3(a) provides in relevant part as follows

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*Barrows, there can be no question but that Sullivan has standing to maintain this action.*

*Sullivan,* 396 U.S. at 237 (emphasis added).

Likewise, in the case at hand, Plaintiff alleged in his complaint that he was sanctioned or punished when, among other things, University officials "excluded him from decisions and policies affecting the West campus and the Alliance . . . because of Plaintiff's support of affirmative-action policies and minority hires[]" protected under Title VII and § 1981. *See* Plaintiff's Amended Complaint, ¶ 21; J.A. at 100027. Plaintiff also alleged that he was sanctioned or punished for his advocacy on behalf of female and minority hires through his termination, or "expulsion" if you will, from employment by the University. *See id.,* ¶ 28; J.A. at 100029. As in *Sullivan,* if these "sanctions" were allowed to go unredressed, it would give impetus to the perpetuation of racial and minority discrimination in hiring which Title VII of the Civil Rights Act of 1964, affirmative action programs, and § 1981, were designed to prevent. *See Kaiser Aluminum & Chemical Co.,* 443 U.S. at 201; *Sullivan,* 396 U.S. at 237; *Winston,* 558 F.2d at 1270 (finding that the Supreme Court's holding in *Sullivan,* while directed to § 1982, was applicable to § 1981 inasmuch as both statutes were originally enacted as part of the Civil Rights Act of 1866 and were designed with the same purpose in mind: "to uproot the institution of slavery")[6].

---

[6] In light of *Sullivan*, and in light of *Winston's* holding that *Sullivan* is applicable to § 1981 claims, the dissent's contention that the majority cannot point to any case where general advocacy of minority rights has been found to violate either § 1981 or Title VII, is unfounded. Furthermore, as stated throughout this opinion, simply because it was Plaintiff's job to insure that Defendants did not engage in discriminatory hiring practices the likes of which Defendants had previously been found to employ, does not thereby immunize Defendants from retaliating against Plaintiff for doing his job. Obviously, the dissent's question as to how the situation would differ if the advocacy was for a plan that failed to meet the standard of *Croson v. City of Richmond*, 478 U.S. 1016 (1986) is rhetorical. If an employee was retaliated against by his employer for

Contrary to the district court's assertion, Plaintiff's status as a high-level affirmative action official does not change the fact that his advocacy on behalf of women and minorities is protected activity or that he is a member of a protected class. Simply because the employer has placed an individual in the position of a high-level affirmative action officer and contracted with the individual to advocate on behalf of women and minorities to insure equality in employment within the institution, does not thereby immunize the employer from being held liable for illegally discriminating against that individual for such advocacy. To hold otherwise would allow an institution to contract with an individual for the position of a "high level affirmative action official;" put into place an allegedly nondiscriminatory hiring practice such as the A-900 process; circumvent the hiring process against the express advocacy and advice of the affirmative action official; and discriminate or retaliate against the affirmative action official for his advocacy, thus sending a message to the official that he either remain silent or be "punished."

Said differently, an employer inclined to engage in invidious discrimination in the workplace could hire an affirmative action official in order to convey the false impression that the employer is interested in eliminating illegal discrimination from the workplace, and proceed to retaliate against the official secure in the knowledge that no legal claim could be lodged against the employer for its actions. Thus, to hold that a high-level affirmative action official cannot bring a Title VII claim for discrimination based upon his or her advocacy of women and minorities would be to invite stratagems designed to circumvent, and

---

speaking out on behalf of minorities, whether or not a plan met the standard of *Croson*, the employee may have a viable claim – irrespective of the employee's race or ethnicity -- under § 1981 or Title VII. *See Sullivan v. Little House Park, Inc.,* 396 U.S. 229, 231-37 (1969); *Tetro v. Popham*, 173 F.2d 988, 994 (6th Cir. 1999); *Winston v. Lear Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir. 1997). Indeed, the Supreme Court found Sullivan's "advocacy . . . for trying to vindicate the rights of minorities" to be protected conduct such that Sullivan had standing to sue. *See Sullivan*, 396 U.S. at 237.

indeed, to violate law which was designed to serve "as a spur or catalyst to cause 'employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history . . . .'" *Kaiser Aluminum & Chem. Corp.,* 443 U.S. at 204 (quoting *Albemarle Paper Co. v. Moody,* 442 U.S. 405, 418 (1975)).

Therefore, having found that Plaintiff was indeed a member of protected class, and that he proffered direct evidence that he was discriminated against because of his advocacy, we believe that a question of fact exists for the jury to decide whether Defendants terminated Plaintiff out of a discriminatory animus.[7] The district court's approach to this matter turns back the hands of time on the issue of civil rights

---

[7]An example of such direct evidence offered by Plaintiff is taken from Plaintiff's deposition testimony made in response to the question of whether Dr. Steger, in Plaintiff's view, expressed race consciousness in making hiring decisions:

During the search for the provost at the University, I made a recommendation to Dr. Steger that proactive consideration be given to Dean Castenell; that based upon the candidates being brought into the University from outside that I felt Dean Castenell had more experience and would be more effective.

Dr. Steger's response was, "We already have two black vice presidents. I can't bring in a black provost." My response was, "Dr. Steger, you're the President of the University, and it's my expectation that you demonstrate the issues and concerns in staffing is that we get the best person available, not the fact that you've got three senior black officers." His response was, "Faculty would kill me if I would bring in a black provost, particularly with us already having two black vice presidents at the University."

That was a very disturbing response, to me, for a president to be making to the Vice President of Human Resources, when I had been charged always to ensure that we hire the best person possible and that we always identify a diverse pool of candidates and that we give full consideration to them based upon experience, their expertise, and whether they would be able to do the job or not.

(J.A. at 100737-38.)