RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0189P (6th Cir.)
File Name: 02a0189p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ALEX VAUGHN and GEORGE
RIVERS,
       *Plaintiffs-Appellants,*

       *v.*

WATKINS MOTOR LINES, INC.,
       *Defendant-Appellee.*

No. 01-3049

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00210—Herman J. Weber, District Judge.

Submitted: May 3, 2002

Decided and Filed: May 30, 2002

Before: MERRITT, SUHRHEINRICH, and GILMAN,
Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Mark Joseph Byrne, JACOBS, KLEINMAN,
SEIBEL & McNALLY, Cincinnati, Ohio, for Appellants.
Frank B. Shuster, CONSTANGY, BROOKS & SMITH,
Atlanta, Georgia, Angela M. Hubbell, CONSTANGY,
BROOKS & SMITH, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.  George Rivers and Alex Vaughn brought this lawsuit against Watkins Motor Lines, Inc., their former employer, alleging that Watkins (1) violated the Fair Labor Standards Act (FLSA) by refusing to pay them overtime wages, and (2) discriminated against them on the basis of their race by terminating their employment.  Watkins, a corporation that transports freight throughout the United States, filed a motion for summary judgment on both claims.  It argued that the Motor Carriers Act (MCA) exempted Rivers and Vaughn from the FLSA's overtime-wage requirements because they were truck loaders engaged in motor carrier safety.  With respect to the plaintiffs' second claim, Watkins contended that Rivers and Vaughn had neither established a prima facie case of racial discrimination nor offered sufficient evidence to show that Watkins's proferred reason for terminating their employment was a pretext to mask discrimination.  The district court granted Watkins's motion for summary judgment on both claims.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  Factual background

Rivers began working for Watkins as a part-time dockworker in 1991.  He became a full-time employee in June of 1992.  Vaughn had a similar job progression, starting as a part-time dockworker with Watkins in January of 1997 and securing a full-time position in October of that year.  Both Rivers and Vaughn worked at Watkins's Cincinnati, Ohio terminal.

As dockworkers, Rivers and Vaughn were responsible for unloading freight from inbound trailers, moving the goods to their proper place for transshipment, and loading the freight

onto outbound trailers. Approximately 50 dockworkers worked under the supervision of 3 to 5 managers at any one time.

Rivers and Vaughn received assignments from their supervisors, but they worked with a significant degree of independence. Their responsibilities included "blocking" freight, which required the use of various materials to stabilize the load and prevent it from shifting during transit. In addition, they frequently had to load trailers "high and tight," so that all available space from front to back and floor to ceiling was occupied. Vaughn was formally instructed on how to accomplish these tasks when he began working for Watkins. Rivers, on the other hand, acquired his knowledge from on-the-job experience.

Supervisors at times provided specific instructions to Rivers and Vaughn with respect to the manner in which they were to load the freight. At other times, however, Rivers and Vaughn worked without any direct supervision and exercised their discretion in deciding how best to block and load the trailers. In doing so, they attempted to distribute the weight of the freight evenly in order to prevent the load from shifting during transit. Rivers and Vaughn would seek the assistance of their supervisors if they were uncertain about the best way to load a trailer. A supervisor would inspect all loaded trailers before they were closed and inform Rivers or Vaughn whether they needed to alter the placement of the freight.

If the freight included hazardous materials, Rivers and Vaughn were responsible for preparing diagrams of the location of that cargo so that emergency crews would be able to find it in the event of an accident. Both Rivers and Vaughn generally performed this duty, and they were given periodic training in the proper handling of dangerous materials.

In December of 1998, Michael Coyne, the terminal manager at Watkins's Cincinnati facility, posted a notice informing the dockworkers that they would be required to work 50-hour workweeks during seven specified weeks in 1999 because of the high volume of freight anticipated during

that year. The first such week was February 21 through February 27, 1999. Employees could work the extra two hours each day either before or after their normal shifts.

Neither Rivers nor Vaughn worked the extra two hours on any day during the week of February 21, 1999. According to Rivers, he informed his supervisors each morning at the conclusion of his regular shift that he was leaving, and they allowed Rivers to go without asking him whether he had worked a ten-hour day. These supervisors, however, had not been present when Rivers began his shift, so they were not aware of whether he had worked ten hours or only eight. Moreover, none of the supervisors whom Rivers identified remembered any conversation in which Rivers spoke with them about leaving work early.

Vaughn similarly told his supervisors that he was leaving at the end of his shift, even though he had not worked ten hours. After one of Vaughn's supervisors asked him to explain why he was refusing to work an extra two hours each day, Vaughn prepared a written statement on February 25, 1999. In this document, Vaughn expressed his belief that the 50-hour workweek was a violation of Ohio and/or federal law.

Rivers and Vaughn were discharged in early March of 1999 because they had refused to work the required 50-hour workweek. According to the plaintiffs, both of whom are African-American, their firing was racially motivated.

Prior to his termination, one of Vaughn's supervisors informed him that Watkins was interested in establishing a recruitment program to attract minorities into management positions. Vaughn sought to participate in the program, and claims that he took and passed the required test. In February of 1999, however, Vaughn was informed that he was not eligible for a promotion in light of his poor attendance record for the past six months. Vaughn does not dispute that he had received disciplinary warnings regarding his attendance during that time period, but contests the accuracy of Watkins's records. In addition, Vaughn claims that several

created by the *prima facie* case does not occur unless the plaintiff establishes the elements of the *prima facie* case by a preponderance of the evidence").

For the same reason, Vaughn's contention that he was not selected to become a supervisor, even though he passed the preliminary test, is immaterial. This evidence seeks to cast doubt upon Watkins's proffered reason for terminating Rivers and Vaughn. But like the plaintiffs' claim that they had permission to leave work early, Vaughn's inability to become a manager does not alter the fact that the plaintiffs failed to establish a prima facie case of discrimination. Although Vaughn's deposition testimony that Caucasian employees who had failed the test were promoted to supervisory positions might be relevant in a failure-to-promote racial discrimination claim, Vaughn does not assert such a claim. Rivers and Vaughn instead alleged that Watkins discriminated against them on the basis of their race by terminating their employment. Watkins's refusal to promote Vaughn therefore has no bearing on the question of whether Rivers and Vaughn established a prima facie case for the particular employment discrimination claim that they asserted.

We therefore conclude that the district court did not err in granting summary judgment in favor of Watkins on the plaintiffs' racial discrimination claims. Moreover, our conclusion eliminates the need to address Watkins's alternative argument that Rivers and Vaughn were unable to establish a genuine issue of material fact with respect to whether the proffered reason for their being discharged was a pretext designed to mask discrimination.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial"). The rapidly changing workforce at Watkins does not eliminate the necessity of presenting specific facts that would support a finding that dockworkers who were not African-Americans replaced Rivers and Vaughn.

Moreover, evidence relating to Watkins's employees, including the dates that particular individuals began working as dockworkers, was presumably available in the normal course of discovery. There is no indication in the record that Rivers and Vaughn lacked a full opportunity for discovery or that Watkins failed to respond to discovery requests. The inability of Rivers and Vaughn to identify any specific employees who replaced them is therefore fatal to their attempt to establish a prima facie case of discrimination. *Id.* at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery.").

Rivers and Vaughn attempt to avoid this deficiency by contending that they informed their supervisors that they were leaving early before departing at the end of their eight-hour shifts. This argument, as Rivers and Vaughn recognize, attempts to create a genuine issue of material fact with respect to whether Watkins's articulated reason for discharging them—their leaving work early without obtaining the permission of a supervisor—was a pretext to mask discrimination. Watkins's explanation for its decision to terminate Rivers and Vaughn, however, is irrelevant in light of the fact that they failed to establish a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802 (explaining that the employer's burden of articulating a legitimate reason for an adverse employment action does not arise until the plaintiff establishes a prima facie case of discrimination); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996) (noting that "the 'burden-shift'

Caucasian employees failed the promotion test but were nevertheless elevated to management positions.

## B.    Procedural background

Vaughn filed this lawsuit in March of 1999. An amended complaint adding Rivers as a plaintiff was filed a month-and-a-half later. Rivers and Vaughn alleged that Watkins (1) violated the FLSA's overtime-wage provisions, 29 U.S.C. § 207(a)(1), by refusing to pay them one-and-one-half times their regular hourly rate for overtime hours, and (2) terminated their employment because of their race, in violation of both federal law (42 U.S.C. § 1981) and Ohio law (Ohio Rev. Code § 4112.02). In addition, Rivers and Vaughn asserted several state-law claims based upon their belief that they were paid less that they were entitled to receive, and that they were discharged in retaliation for complaining about Watkins's refusal to pay overtime wages.

Watkins filed a motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, in January of 2000. It first argued that the FLSA's overtime-wage provisions did not apply to either Rivers or Vaughn because the MCA exempts employees who are engaged in work that affects the safe operation of motor vehicles from the FLSA's overtime requirements. 29 U.S.C. § 213(b)(1); 49 U.S.C. § 31502(b)(1). Watkins insisted that both Rivers and Vaughn fall within this exemption. With respect to the racial discrimination claims, Watkins argued that neither Rivers nor Vaughn established a prima facie case of discriminatory discharge. And even if Rivers or Vaughn had set forth a prima facie case, Watkins maintains that it presented a legitimate nondiscriminatory reason for terminating their employment—their leaving work early without obtaining the permission of a supervisor—and that the record contained no evidence that its explanation was a pretext designed to hide unlawful discrimination.

The district court agreed with all of Watkins's arguments. As a result, the court granted summary judgment in favor of Watkins on the plaintiffs' FLSA and federal racial

discrimination claims in December of 2000. The district court then declined to exercise supplemental jurisdiction over the plaintiffs' state-law claims, dismissing them without prejudice. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

A district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B. FLSA claims

Rivers and Vaughn first allege that Watkins violated the FLSA's overtime-wage provisions. The FLSA establishes a general rule that requires employers to compensate any employee "at a rate not less than one and one-half times the regular rate at which he is employed" for the time worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). This overtime-wage requirement, however, does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service . . . ." 29 U.S.C. § 213(b)(1). The MCA in turn gives the Secretary of Transportation "the authority to regulate the hours of an employee (1) who works for a private motor carrier that provides transportation in interstate commerce and (2) whose work activities affect the safety of operation of that motor carrier." *Troutt v. Stavola Bros., Inc.*, 107 F.3d 1104, 1106-07 (4th Cir. 1997) (internal

satisfy this burden, the plaintiff must then "prove that the proferred reason was actually a pretext to hide unlawful discrimination." *Id.*

Watkins contends that Rivers and Vaughn have failed to present a prima facie case of discriminatory discharge based upon race. This initial burden requires them to establish that they (1) were members of a protected class, (2) were qualified for their positions, (3) suffered an adverse employment action, and (4) were replaced by individuals who were not members of their protected class. *Id.* at 572-73 (noting the elements of a prima facie case of employment discrimination for both § 1981 and Title VII of the Civil Rights Act of 1964).

Rivers and Vaughn are both African-Americans, a protected class, and Watkins does not dispute that they were qualified to serve as dockworkers. Moreover, their discharge constituted an adverse employment action. The sole disputed element necessary for them to establish a prima facie case of discrimination thus boils down to whether they were replaced by individuals who were not African-Americans.

Although Rivers and Vaughn allege that Watkins has hired new dockworkers since the date of their discharge, the record contains no evidence regarding the particular dockworkers that Watkins hired. The plaintiffs concede this fact, but insist that "the constant influx of employees at Watkins" prevented them from being able to identify the specific employees who were hired after they were discharged. There is thus no evidence concerning the race of the dockworkers who allegedly replaced the plaintiffs. Rivers and Vaughn inexplicably fail to address this problem, nor do they even allege that the new dockworkers were not members of their protected class.

We conclude that the plaintiffs' unsupported allegations are insufficient to create a genuine issue of material fact with respect to whether they established a prima facie case of discrimination. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (explaining that "Rule 56(e) itself provides that a party opposing a properly supported motion for

For the preceding reasons, we believe that all reasonable jurors would find that Rivers and Vaughn exercised the judgment and discretion necessary to be classified as loaders. Their duties, consistent with the definition of a "loader," had a substantial effect on the safe operation of motor vehicles. As a result, the Secretary of Transportation had the authority to regulate their qualifications and maximum hours of service, thus making the FLSA's overtime-wage provisions inapplicable to them. We therefore conclude that the district court did not err in granting summary judgment in favor of Watkins on the plaintiffs' FLSA claims.

## C.   Racial discrimination claims

Rivers and Vaughn also allege that Watkins terminated their employment because of race. Watkins, on the other hand, insists that its decision to discharge them was not racially motivated, but was due to their refusal to work the overtime hours.

In order to establish an employment discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (setting forth the requirements for § 1981 racial discrimination claims). Neither Rivers nor Vaughn offered any direct evidence of discrimination. As a result, the burden-shifting approach first set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), applies to the present case. *Johnson*, 215 F.3d at 572.

Under the *McDonnell Douglas* framework, the plaintiff faces the initial burden of presenting a prima facie case of discrimination. *Johnson*, 215 F.3d at 572. The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. *Id.* at 573. If the defendant is able to

quotation marks omitted); 49 U.S.C. § 31502(b)(2) (providing that the Secretary of Transportation has the power to specify the maximum number of hours for employees who work for private motor carriers "when needed to promote safety of operation"); *Benson v. Universal Ambulance Serv., Inc.*, 675 F.2d 783, 785 (6th Cir. 1982) (noting that the MCA grants this authority to the Secretary of Transportation, thereby exempting the specified employees from the FLSA's overtime-wage provisions).

Both the plaintiffs and Watkins recognize the potential applicability of this exemption to the present case. They also agree that "loaders" are not covered by the FLSA's overtime-wage provisions. *See Levinson v. Spector Motor Serv.*, 330 U.S. 649, 673 (1947) (recognizing that the Interstate Commerce Commission (ICC), which originally had the authority now conferred by the MCA on the Secretary of Transportation, possessed the power to regulate the hours of loaders). A loader is an employee of a private motor carrier whose duties include loading and unloading motor vehicles "so that they may be safely operated on the highways of the country." 29 C.F.R. § 782.5(a) (defining a "loader" for the purpose of the MCA); *Levinson*, 330 U.S. at 652 n.2, (approving a similar definition that the ICC had adopted). The applicable regulations recognize a loader's role in the safe operation of motor vehicles by specifying that an employee works as a loader "so long as he has responsibility when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized." 29 C.F.R. § 782.5(a).

Despite these points of commonality, the plaintiffs and Watkins disagree as to whether these two dockworkers exercised the judgment and discretion necessary to be considered loaders. Rivers and Vaughn argue that genuine issues of material fact exist with respect to the manner in which they performed their duties. They therefore believe

that the district court erred in concluding as a matter of law that the FLSA's overtime provisions do not apply to the present case.  In contrast, Watkins contends that the undisputed facts support the district court's finding that Rivers and Vaughn were exempt from the FLSA's overtime-wage requirements.

Both plaintiffs acknowledge that they generally exercised their own judgment and discretion with respect to the most appropriate ways to load the trailers.  Although they would occasionally consult with their supervisors, they also independently decided how to block the freight and load it high and tight.  Moreover, Rivers and Vaughn prepared diagrams that designated any hazardous materials in the trailers.  These schematic sketches were intended to enable safety workers to reach the hazardous cargo quickly in the event of an accident, a purpose that Rivers and Vaughn both acknowledged.  Despite these duties, the plaintiffs argue that they frequently operated under the direct control of a supervisor, and that a supervisor would always check each trailer before it was closed.

In *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193 (4th Cir. 1969), the Court of Appeals for the Fourth Circuit rejected an FLSA claim under circumstances that are almost identical to the facts of the present case. The plaintiffs in *Blankenship*, like Rivers and Vaughn, were dockworkers whose duties included the loading of trailers.  They argued that because they were closely supervised, they had no independent responsibility for the safe operation of the vehicles.  The dockworkers therefore contended that they were not exempt from the FLSA's overtime-wage provisions. *Id*. at 1195.

After recognizing that the Thurston dockworkers were not told exactly where to place every item on a trailer, but instead "exercised significant discretion in performing their task of loading freight," the *Blankenship* court rejected their argument with reasoning that is equally applicable to the present case: "It is true that they and the other loaders were

supervised, that is, were told which trucks to load and that their work was checked, albeit somewhat haphazardly. These factors, however, do not render inconsequential the initial discretion exercised by [the dockworkers]." *Id*. at 1197. The Fourth Circuit therefore held that "at least where, as here, the employee retains some appreciable discretion in conducting the loading operation in the first instance, his employer is exempt from the overtime provisions of the FLSA." *Id*.

Rivers and Vaughn performed duties that are nearly identical to the responsibilities of the dockworkers in *Blankenship*.  Moreover, unlike the *Blankenship* loaders, Rivers and Vaughn also were responsible for preparing diagrams of any hazardous materials that they had loaded in the trailers.  The significance of these activities is not diminished by virtue of the fact that the supervisors at Watkins checked the trailers before they were closed and on occasion told Rivers and Vaughn how to load the freight.

Although the Supreme Court has recognized that the MCA's exemption does not apply where an employee's activities have only a tangential effect on the safe operation of vehicles, this *de minimis* rule is not based upon whether the worker was supervised in activities that have an undeniable, direct effect on safety. *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 708 (1947) (recognizing that "the mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so trivial, casual or occasional a part of an employee's activities, or his activities may relate only to such articles or to such limited handling of them, that his activities will not come within the kind of 'loading' which is described by the Commission and which, in its opinion, affects safety of operation"); *Blankenship*, 415 F.2d at 1196 (noting that situations in which the *de minimis* rule applies involve factors "other than the issue of the degree of supervision or discretion assigned to the employee"). The *de minimis* rule thus does not apply in the present case.