**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0554n.06
Filed: August 3, 2006

**No. 04-6315**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| JENNIFER ELLEN SUITS, )<br><br>Plaintiff-Appellant, )<br><br>v. )<br><br>THE HEIL CO. )<br>d/b/a )<br>Heil Environmental Industries, Ltd., )<br><br>Defendant-Appellee. )<br> )<br> ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |

**Before:** **BOGGS, Chief Judge; GIBBONS, Circuit Judge; and ROSE, District Judge.[1]**

**BOGGS, Chief Judge**. Jennifer Ellen Suits was fired on September 3, 2002, when she was five and one-half months pregnant. Suits claims that Heil Corporation, her former employer, violated the Tennessee Human Rights Act (THRA), the Pregnancy Discrimination Act (PDA), and Title VII of the Civil Rights Act of 1964 (Title VII) by terminating her employment due to her pregnancy and sex. Heil asserts that the termination was part of a business-related reduction in workforce. The district court granted Heil's motion for summary judgment following fairly

---

[1]The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

1

substantial discovery, including the taking of depositions and/or affidavits from roughly twenty individuals. We affirm.

## I

Heil, headquartered in Chattanooga, Tennessee, makes dump trucks.

On February 12, 2000, Suits was hired by Heil as a Law and Human Resources Associate. Her duties at Heil included preparing personnel reports, disability billing, and other paperwork and administrative duties, in both the Law and Human Resources departments. As the district court noted, "[b]y all accounts, Plaintiff was an efficient and productive employee."

On September 3, 2002, Suits's employment was terminated. She was five and one half months pregnant when her employment ended. On October 22, 2002, she filed an EEOC complaint. She claimed Heil violated the THRA, the PDA, and Title VII when it terminated her employment due to her pregnancy and sex. She claimed that, at roughly the time of her termination, Heil eliminated the positions of three female employees at its Chattanooga office (and only those employees), each of whom, she claims, was pregnant or "openly trying to become pregnant" in September 2002.

The EEOC issued a right to sue letter, and Suits filed suit in state court. Heil removed the case to federal court and then moved for summary judgment. The district court granted the motion. Suits filed timely notice of appeal with this court.

## II

A district court's grant of summary judgment is reviewed *de novo*. Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 657 (6th Cir. 2000) (citing Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc., 96 F.3d 174, 178 (6th Cir. 1996)). In a motion for summary judgment, the moving party bears

2

the burden of showing that no genuine issue of material fact exists. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). The district court must view the evidence in the light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Claims of discrimination under the THRA are analyzed in the same way as claims made under Title VII. Frizell v. Southwest Motor Freight, 154 F.3d 641, 646-47 (6th Cir. 1998); Campbell v. Florida Steel Corp., 919 S.W. 2d 26, 31 (Tenn. 1996)). A plaintiff must offer "direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." Johnson v. Kroger Co., 319 F.3d 858, 864-65 (6th Cir. 2003). The plaintiff need satisfy only one of these (direct or circumstantial) requirements to survive a summary judgment motion on the merits. Kline v. Tenn. Valley Auth., 128 F.3d 337, 348-49 (6th Cir. 1997). We analyze the direct and circumstantial paths in turn, *infra,* after laying out the legal frameworks for each in further detail immediately below.

In the Sixth Circuit, "direct evidence" is that which is probative of an alleged fact without requiring further inference. Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548 (6th Cir. 2004). It is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999); *see also* Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 433 (6th Cir. 2002).

Circumstantial evidence is that which requires further inference. Reliance on such evidence to make a successful *prima facie* showing of discrimination triggers the McDonnell Douglas burden-shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981); Vaughn v. Watkins Motor Lines, Inc. 291 F.

3

3d 900, 906 (6th Cir. 2002) (holding that <u>McDonnell Douglas</u> analysis requires the plaintiff to satisfy the burden of setting out the *prima facie* case (citing <u>Johnson v. Univ. of Cincinnati</u>, 215 F.3d 561, 572 (6th Cir. 2000)). The *prima facie* case establishes a rebuttable presumption of discrimination. <u>Vaughn</u> at 906 (citing <u>Univ. of Cincinnati</u> at 573). The defendant must then offer a legitimate, nondiscriminatory basis for its conduct. If the defendant makes such a proffer, the burden then shifts again to the plaintiff, who must show that the defendant's articulated basis is pretextual. <u>Ibid</u>. The burden of proof in this <u>McDonnell Douglas</u> framework remains essentially with the plaintiff throughout this process. <u>Hartsel v. Keys</u>, 87 F.3d 795, 800 (6th Cir. 1996). If the plaintiff fails to make a showing of pretext, the district court may enter summary judgment for the defendant.

### III

In her direct evidence case, Suits claims that, at some point during the summer of 2002, William Nehrkorn, vice president and general counsel of Heil and head of the company's Law, Human Resources, and Export departments, made "numerous discriminatory statements regarding Mrs. Suits' pregnancy and gender." Nehrkorn stated in deposition that he does not recall whether Appellant was pregnant at the time of her termination. Appellant alleges that she spoke about her pregnancy with him and that she was visibly pregnant during her employment.

Suits alleges that Nehrkorn was the "decision maker regarding her termination." Though Appellee acknowledges that Nehrkorn was "responsible for the reduction of expenses in both the Law and Human Resources Departments," it emphasizes that Suits's "supervisors during her employment were Mary Heise (Corporate HR Manager) and Sharon Caldwell (Executive

4

Assistant).” Despite this minor distinction offered by the defendant, it is essentially uncontroverted that Nehrkorn was Suits's manager, and that he was the decision-maker regarding her termination.

Appellant alleges that Nehrkorn commented on her pregnancy. According to her, he made three statements that reflected his knowledge of her pregnancy and his discriminatory views:

1) he that he said to her that she was “not the type of person to leave” her child.

2) “How are you going to come back to work and work here and leave that baby? You know you are not going to be able to do that.”

3) he called her a “hottie ass.”

It is unclear from the record when, exactly, Nehrkorn made his first and second remarks, the ones relating to Appellant-Plaintiff's pregnancy. The district court noted in its Memorandum Opinion that

> Plaintiff has not pinned down any approximate dates except to generally allege [the comments] were made ‘some time between the first week of May and the last week of August, 2002’ . . . .

There is thus no direct evidence that the comments were made after the need to eliminate jobs arose in the middle of 2002. Appellant proposes that other employees can and do confirm that Nehrkorn made inappropriate remarks about her pregnancy. One of her putative witnesses, Sharon Caldwell, remembers Nehrkorn's having made remarks that would indicate only his knowledge of Suits's pregnancy, not any negative or disparaging remarks about it. Heil aptly notes further that “[w]hen asked whether Mr. Nehrkorn made *any* comment with respect to Plaintiff's pregnancy, Ms. Caldwell responded that she could not recall any specific comments made by Mr. Nehrkorn.”

Another putative witness identified by Suits, employee Steve Scott, testified at deposition that Nehrkorn once made a “statement . . . that I thought was inappropriate,” but he testified nearly

simultaneously that he could not recall whether Appellant or any other person was present at the time of the remark, and he did not state either what the remark was or whether it was designed to refer to Suits.[11] The district court concluded that, "even assuming the hearsay problem [associated with this alleged comment] could be overcome," this remark can constitute, due to its ambiguity and to the ambiguity of the deponent as to its nature, timing, and directionality, no direct evidence for the purposes of the analysis here. The district court offered no explanation for its view that there is a "hearsay problem" with Scott's testimony. Scott testified at his deposition that he heard Nehrkorn make "a statement . . . that I thought was inappropriate." This is opinion testimony, but it is not hearsay. The district court appears to be quite right, however, in emphasizing the ambiguity of Scott's testimony.

With respect to the third and perhaps most controversial remark attributed to Nehrkorn ("hottie ass"), the district court noted that Appellant does not assert that she actually heard Nehrkorn

---

[11] The exact colloquy on this question follows:

> Q. Did you ever hear Bill Nearcorn [sic] make any comments about Ms. Suits related to her gender or pregnancy?
> A. No.
> Q. Did you ever hear Mr. Nearcorn make a statement to Ms. Suits and I'm going to quote this: That she was a hottie ass?
> A. No.
> Q. You don't remember Mr. Nearcorn making that statement?
> A. Not that specific statement. No.
> Q. Did you remember him making another similar statement?
> A. I remember him making a statement at the time that I thought was inappropriate.
> . . . .
> Q. But do you recall Mr. Nearcorn making a statement to Ms. Suits that you felt was inappropriate?
> A. I recall Mr. Nearcorn making a statement which in my opinion I thought was inappropriate. I do not recall if Ms. Suits was present or not.

use that phrase, and that this portion of her claim is based on inadmissible hearsay. The court's reading is correct. The only evidence put forward by Suits that Nehrkorn made this remark is in her affidavit, in which she avers that "I learned that Bill Nehrkorn during a conversation with another Heil employee referred to me as a 'hottie ass.'" The district court correctly concluded that such a statement–which is clearly hearsay–cannot be considered to have probative value for the purpose of supporting Suits's pregnancy or gender discrimination claims.

In the absence of the third of Nehrkorn's putative remarks, only his predictive commentary about her inability to leave her baby and return to work remains.

To prevail based on direct evidence, plaintiff must show that the defendant employer acted on its discriminatory animus, not just that it possessed one. *See* DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004); Hein v. All America Plywood Co., 232 F.3d 482, 488 (6th Cir. 2000). We agree with the district court that Nehrkorn's remarks about Suits are not exactly "stray" or "innocuous" statements which cannot constitute adequate direct evidence of animus. *See, e.g.* Hull v. Cuyahoga Valley Bd. of Educ., 926 F.2d 505, 514 (6th Cir. 1991) However, we agree further that, because it is hard to pin down the precise dates of the remarks, and because the vague time line we are able to discern suggests that they were made up to three months before Suits's termination, it is not possible to demonstrate sufficient nexus between the attitude that might be reflected in the remarks and the adverse employment action.

This conclusion is especially compelling when the facts of this case are compared to those of Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 571-72 (6th Cir. 2003) (*en banc*), in which we held that ageist comments established a genuine issue of material fact as to the possibly discriminatory nature of employer conduct, and that there was a sufficient showing that the animus

7

might have been a motivating factor in the adverse employment action. In that case, the employee's managers were found to be making remarks about his protected age status in connection with his eligibility for ongoing employment in the same capacity. Indeed, in that case, his managers mentioned age (though not as offensively as they appear to have mentioned it at other times) at the meeting at which his demotion was announced and explained to the other employees of the firm. Wexler, 317 F.3d at 569. By contrast, plaintiff has collected no direct evidence, beyond the fact that both the termination and the alleged remarks were made in the rough period around the summer of 2002, connecting Heil's adverse employment action and Nehrkorn's possible predisposition to stereotypical views about pregnant women and mothers of newborn children.

We adopt the district court's well-reasoned and -researched legal conclusion as to the direct evidence offered by Suits:

> Liberally construing the evidence in Plaintiff's favor, her only *direct* evidence of discrimination are remarks by Nehrkorn in a casual setting indicating he held certain stereotypical beliefs about new mothers as workers which *might* have been made with the knowledge he was going to have to reduce expenses and/or lay off one or more employees under his supervision. Standing alone, this evidence, even if believed, does not *require* the conclusion Plaintiff's pregnancy was a motivating factor in Nehrkorn's decision to eliminate her position. While Nehrkorn's remarks are not entirely innocuous "stray" remarks, their context and setting are not sufficient to establish a link or nexus between Plaintiff's pregnancy and the adverse employment action. Additional inferences are necessary, which compels the conclusion a direct evidence claim has not been established. *Johnson*, 319 F.3d at 865 ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.").

Thus, the district court was correct to conclude that Suits failed to present direct evidence permitting an inference that discrimination motivated her termination.

8

**IV**

We outlined above the basic architecture of the circumstantial evidence analysis.

To prevail in a Title VII discrimination suit based on circumstantial evidence, the plaintiff must first make a *prima facie* case of discrimination. In cases of alleged pregnancy discrimination, the plaintiff must show: 1) that she was pregnant; 2) that she was subject to an adverse employment action; 3) that she was qualified for the position in question: 4) that there is a nexus between her pregnancy and the adverse employment action. Prebilich-Holland v. Gaylord Entm't Co., 297 F.3d 438, 442 (6th Cir. 2002).

The first three elements are undisputed.

Satisfying the fourth prong is more difficult. At minimum, the employer must have had actual knowledge of the pregnancy at the time of the employee's termination. Prebilich-Holland at 444. Under this court's precedent, in an employment discrimination case in which the defendant has put forward workforce reduction as its legitimate business reason for the adverse employment decision (frequently referred to as a "reduction in force" or "RIF" argument), a

> plaintiff has not presented any evidence indicating that the work force reductions are not the reasons for the discharge and therefore does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.

Barnes v. GenCorp. Inc., 896 F.2d 1457, 1465 (6th Cir. 1990), *cert. denied*, 498 U.S. 878 (1990) (citing La Grant v. Gulf and Western Mfg. Co., 748 F.2d 1087, 1090 (6th Cir. 1984) ("[t]he mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of age discrimination").

9

The content of this fourth prong in RIF cases is not wholly clear. In order to give the plaintiff the benefit of the doubt in the absence of clear direction from precedent, the district court found that "Plaintiff's direct evidence of discrimination (*i.e*. Nehrkorn's two sets of lunch comments) is sufficient to satisfy the fourth prong of her *prima facie* case." Perhaps by way of explanation of its favoring the plaintiff in this particular, the court cited Burdine at 253 for the proposition that the "burden of establishing a prima facie case of disparate treatment is not onerous." We decline to rule that evidence (e.g., the lunchtime comments) that failed to satisfy the direct evidence requirement in employment discrimination cases will necessarily or even usually satisfy the fourth prong of the circumstantial evidence analysis. However, we adopt the district court's approach as reasonable.

Defendant offers as its legitimate business reason for the adverse employment decision a company-wide plan to cut operating costs. In its defense, Heil observes that it "experienced a financial downturn as a result of changes in the U.S. economy in 2001-2002," particularly in the wake of the terrorist attacks of September 11, 2001. Heil notes that its "operating earnings" were $45 million in 2000 but $22 million in 2002. In consequence, it pursued a "broad expense-reduction plan across the entire Company" beginning in mid-year 2002. Specifically, "each department manager was asked to reduce expenses in his/her area by 15%." Employee headcount reduction was explicitly contemplated in management discussions. Heil undertook many cost-cutting measures in addition to headcount reduction, including pension reduction, insurance reduction, and executive perk reduction.

Appellee acknowledges that Nehrkorn was "responsible for the reduction of expenses in both the Law and Human Resource Departments." It alleges that Nehrkorn based the headcount

10

reduction in his department on the seniority of the employees to be affected. Suits enjoyed less seniority than any other member of the Law or Human Resources Departments. She had worked for roughly 2 years at Heil, while Sharon Caldwell (Executive Assistant) had worked there for roughly 3 years, Mary Heise (Corporate HR Manager) for roughly 10, Jack Danner (Corporate Director of HR) for roughly 23, and Nehrkorn himself for roughly 29.

Heil notes that Nehrkorn eliminated three employees within his supervision "as part of the expense reduction process in August 2002." These included Suits, Jack Danner, and Kevin Coombes, who served as Export Group Manager. Heil emphasizes further that Nehrkorn decided to terminate the employment of male employee Coombes, and not of female employee Sue Dittman, who held the title "Export Manager." Appellee observes further that "[f]our other employees who reported to the Chattanooga office [but not to Nehrkorn] were eliminated at that time–Michelle Ingram, Andrea Wiren, Dave Severson, and Robert Smyth."

Heil urges, *inter alia*, that a wide scope be used to evaluate its conduct. It notes that it eliminated 22 positions company-wide in August 2002; eight of these were held by female employees. In the same "time frame" that gives rise to the facts in the instant case, Heil "closed its Phoenix, Arizona manufacturing facility and its Parts West operations, and the Company consolidated its Parts Inc. operations with its existing Ft. Wayne facility." Heil also shows a general trend by noting that its workforce dropped from 1,100 to 826 from "2000" (no month given) to "September 2002." The Legal Department, according to Nehrkorn's deposition, shrank from two people to one during the August-September 2002 terminations; the Export Group shrank from "[h]alf a dozen, roughly," to three in the same period.

11

To overcome this proffer of a legitimate business explanation under the McDonnell Douglas framework, plaintiff Suits must show that the defendant's reason is pretextual. To achieve this, she must show that the legitimate basis:

1) has no basis in fact,

2) did not actually motivate the action, or

3) was insufficient to motivate the action.

Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

Suits offers four arguments that Heil's explanation was merely pretextual. Like the district court, we take them in turn. None is successful.

1) *Heil did not actually reduce its workforce*. Suits argues that Heil is using misdirection to cover up its discriminatory conduct. Suits argues that Heil's seven-employee calculation is a ruse. She writes that

> [o]f the seven employees allegedly terminated by Heil from the Chattanooga Office, one actually retired, one was rehired within a month, and two were not even located in Chattanooga and they were terminated for cause and replaced. Therefore, the only employees eliminated from the Chattanooga office were three females, who were either pregnant or trying to become pregnant.

She argues that Jack Danner, Kevin Coombes, Dave Severson, and Robert Smythe were either not really terminated or were let go with generous compensation packages. We agree with the district court's conclusion that Suits's analysis as to what actually happened to the seven employees suffers from fatal flaws. For example, Nehrkorn was the decisionmaker with respect to Suits, Danner, and Coombes, but not with respect to the other employees. The district court properly held that "the decisions and actions of other supervisors in complying with the mandated expense reductions in their departments are wholly irrelevant." The district court also correctly observed that

12

Suits "fail[ed] to offer any distinction, argument, or explanation with respect to the other 15 positions Defendant claims were eliminated outside Chattanooga."

2) *Heil had a financial motive to terminate her.* Suits's idea here is that medical insurance is more expensive for pregnant employees than for other employees, so Heil targeted female employees who were pregnant or planning on becoming pregnant. But Suits's argument here is only speculative. Suits alleges that Heil discriminated against female employees who were pregnant or planning on becoming pregnant due to the increased healthcare costs that would obtain, and which Heil, a self-insured company that covered 100% of its employees' healthcare costs, would incur, during and following their pregnancy. Suits does not make a useful offer of specific evidence to support this basis of her claim of Heil's pretext beyond the undisputed observation that Heil was self-insured. She notes only that Nehrkorn did not list her name in his initial draft of employee cost reductions but that he fired her later, anyway. This fact is designed, it seems, to show that Nehrkorn did not intend to terminate Suits until he learned of her pregnancy. This fact would not otherwise support her claim as to financial motive. However, this fact, standing on its on, hardly shows this. More importantly, though Suits does not acknowledge this in her brief, the initial draft of reductions to which she refers is dated August 22, 2002, less than two weeks before her termination. If Suits was five and a half months pregnant at the time of her termination, she would have been five months pregnant at the time he wrote this draft; if, therefore, Nehrkorn knew about her pregnancy on September 3, 2002, he almost certainly would have known about it just a few days earlier. This is true especially in view of Suits's allegation that, some time that summer, he had made some remarks about her pregnancy.

13

Nehrkorn's affidavit affirmatively denies that he considered medical costs associated with Suits's pregnancy when he terminated her. Darren Bird, Heil's CFO, testified in his deposition that, early in 2002, Heil changed its healthcare cost calculation methodology in a manner highly relevant to Suits's claim: Heil decided to amortize the healthcare costs of individual employees across its "cost centers" (which correspond roughly to departments or offices), such that each cost center would be "charged" in its cost calculation only a flat health coverage fee per employee, based on an average cost of employees across the company. In other words, Nehrkorn would have had no financial incentive to eliminate Suits's position based on her pregnancy, insofar as her healthcare costs to his department–no matter how high or low–would have been the same as any other employee's.

3) *Heil had a generally gender-discriminatory atmosphere.* Appellant alleges that managers at Heil were generally discriminatory. She points to three pieces of evidence for this proposition:

She cites the testimony of Andrea Wiren, who said that in July 2002, Ready Truck Manager Steve Dupuis stated that "women should stay home with their children," and that in August 2002 Market Development Manager Richard Ball described a woman he had recently hired as a "trophy female" for his department. The district court was right in observing that Dupuis did not supervise Suits and "was not involved in the decision to eliminate her position. Therefore, Plaintiff has failed to articulate why his sentiments and/or comments are relevant to the question of whether Nehrkorn terminated Plaintiff based on the fact that she was pregnant." We note that stray remarks, particularly those made by a person other than a decision-maker, are not enough to show discrimination. *See, e.g.*, Shefferly v. Health Alliance Plan of Michigan, 94 F. App'x 275, 281 (6th Cir. 2004).

14

Suits has offered evidence that a group of senior Chattanooga-based male managers other than Nehrkorn inadvertently distributed company-wide a lewd and likely sexually explicit voice message through the company's voicemail system. Though the exact content of the conversation is uncertain, it was clearly lascivious. The record as furnished does not offer an indication as to when this conversation was recorded and distributed over the voicemail system. There is no suggestion that Nehrkorn participated in the conversation, or that Suits was the subject of it.

Suits notes also that Heil sent flowers to all of the women employees in the Chattanooga office on Secretary's Day. In other words, the company sent flowers not just to female secretaries on Secretary's Day, but to all female employees on that day.

The district court is ultimately right in its conclusion that these pieces of circumstantial evidence do not rise to the level necessary to show a pervasive discriminatory culture at Heil that would create a genuine issue of material fact as to whether its legitimate business explanation of its adverse employment conduct was pretextual. Our conclusion is case-specific.

4) *Nehrkorn's lunch-time comments may be viewed as proof of pretext*. The district court noted that Nehrkorn's comments may themselves be understood as evidence of pretext. It concluded, however, that "they are . . . insufficient evidence, without further circumstantial evidence, to warrant a reasonable jury in concluding the RIF was a pretext for unlawful discrimination." The court reasoned that the remarks "were in no way connected to or in the context of the decision-making process and the evidence in the record at best only contemplates the *possibility* they were made with the knowledge there was even going to be a decision-making process." Ibid. Again, this conclusion is persuasive. At most, the evidence shows awareness of pregnancy and an opinion as to her, not his, future actions.

15

Suits is unable to show that Heil's offered legitimate, nondiscriminatory reason for its stated conduct was pretextual.

**IV**

Appellant-Plaintiff complains that the district court erred in failing to treat her case as a "mixed-motive" action under Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). Where a plaintiff seeks a "mixed-motive" instruction, he or she carries the burden of showing, through direct or circumstantial evidence, that her protected status played a "motivating part" in the employment decision of the company even though other factors (state of the economy, etc.) were also influential. 42 U.S. §2000e-2(m); Desert Palace, 539 U.S. at 101-02. Where the plaintiff has met this burden, it shifts to the defendant to offer a partial affirmative defense by a preponderance of the evidence. Ibid. Generally, a successful partial affirmative defense will obtain if the defendant can prove it would have taken the same employment action even without the discrimination.

We do not think Desert Palace should be viewed as a modification of the McDonnell Douglas line of cases, as plaintiff argues. The Desert Palace Court did not mention the McDonnell Douglas line. It put the question before it this way: "Specifically, we must decide whether a plaintiff must present direct evidence of discrimination in order to obtain a mixed-motive instruction under 42 U.S.C. § 2000e-2(m)." 539 U.S. at 98. It answered that question in the negative and made clear that mixed motive cases, like other Title VII cases, may be proved either by direct or circumstantial evidence.

In any event, whatever the import of Desert Palace, the availability of mixed-motive analysis and the possibility of proving a mixed-motive case with either direct or circumstantial evidence are of no benefit to the plaintiff. Mixed-motive analysis cannot apply here because plaintiff has failed

16

to come forward with evidence from which a trier of fact could find that discrimination was even partly a motivation for her termination.

## V

Suits's direct evidence does not meet the standard for a prima facie case. Her circumstantial evidence does not meet the standard necessary to show that Heil's articulated legitimate business explanation for its conduct is pretextual. We therefore affirm the district court's grant of summary judgment.